RECEIVED
FEB 1 3 2015
United States Court of Appeals
District of Columbia Circuit

UNITED STATES COURT OF APPEALS
FOR DISTRICT OF COLUMBIA CIRCUIT
FILED FEB 1 3 2015
CLERK

UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| HEARTLAND PLYMOUTH COURT MI, LLC, d/b/a HEARTLAND HEALTH CARE CENTER – PLYMOUTH COURT,<br><br>Petitioner<br><br>v.<br><br>NATIONAL LABOR RELATIONS BOARD,<br>Respondent | PETITION FOR REVIEW<br><br>15-1034 |

*ORIGINAL*

Heartland Plymouth Court MI, LLC, d/b/a Heartland Health Care Center – Plymouth Court, Petitioner herein, hereby petitions the court for review of the Order of the National Labor Relations Board (Board) in NLRB Case No. 7-CA-070626 finding that Petitioner violated Sections 8(a)(5) and (1) of the National Labor Relations Act as amended (Act), 29 U.S.C. §§ 158(a)(5), (1). The Board's order was entered on January 29, 2015 and is reported at 362 NLRB No. 3. This decision adopts a prior decision of the Board, which was issued on July 15, 2013, and is reported at 359 NLRB No. 155. The Board's decisions are attached hereto as Exhibit A. This petition is filed pursuant to Section 10(f) of the Act, 29 U.S.C. § 160(f). A Certificate of Parties and Amici and a List of Parties Served is attached as Exhibit B, and a Corporate Disclosure Statement is attached as Exhibit C.

3216670.1

WHEREFORE, Petitioner hereby requests that the Court grant the petition for review and set aside the order of the NLRB finding that Petitioner violated Sections 8(a)(5) and (1) of the Act and ordering Petitioner to comply with the NLRB's remedial order.

Respectfully submitted this 12th day of February 2015.

_____
**Charles P. Roberts III**

Constangy, Brooks & Smith, LLP
Suite 300, 100 N. Cherry Street
Winston-Salem, NC 27101
Telephone: 336-721-6852
Facsimile: 336 748-9112
croberts@constangy.com

Clifford H. Nelson, Jr.
Constangy, Brooks & Smith, LLC
230 Peachtree St., NW
Suite 2400
Atlanta, Georgia 30303
Telephone: 404-230-6714
Facsimile: 404-525-6955
cnelson@constangy.com

3216670.1

# Exhibit A

3216670.1

*NOTICE: This opinion is subject to formal revision before publication in the bound volumes of NLRB decisions. Readers are requested to notify the Executive Secretary, National Labor Relations Board, Washington, D.C. 20570, of any typographical or other formal errors so that corrections can be included in the bound volumes.*

**Heartland-Plymouth Court MI, LLC d/b/a Heartland Health Care Center-Plymouth Court *and* SEIU Healthcare Michigan.** Case 07–CA–070626

January 29, 2015

DECISION AND ORDER

BY CHAIRMAN PEARCE AND MEMBERS HIROZAWA AND MCFERRAN

On July 15, 2013, the Board issued a Decision and Order in this proceeding, which is reported at 359 NLRB No. 155. Thereafter, the Respondent filed a petition for review in the United States Court of Appeals for the District of Columbia Circuit.

At the time of the Decision and Order, the composition of the Board included two persons whose appointments to the Board had been challenged as constitutionally infirm. On June 26, 2014, the United States Supreme Court issued its decision in *NLRB v. Noel Canning*, 134 S.Ct. 2550 (2014), holding that the challenged appointments to the Board were not valid. Thereafter, the Board issued an order setting aside the Decision and Order, and retained this case on its docket for further action as appropriate.

The National Labor Relations Board has delegated its authority in this proceeding to a three-member panel.

In view of the decision of the Supreme Court in *NLRB v. Noel Canning*, we have considered de novo the judge's decision and the record in light of the exceptions and briefs. We have also considered the now-vacated Decision and Order, and we agree with the rationale set forth therein.[1] Accordingly, we affirm the judge's rulings, findings, and conclusions and adopt the judge's recommended Order to the extent and for the reasons stated in the Decision and Order reported at 359 NLRB No. 155, which is incorporated herein by reference.[2]

---

[1] We agree with the judge that deferral to the arbitral award is not appropriate in this case under the standard articulated in *Spielberg Mfg. Co.*, 112 NLRB 1080 (1955), and *Olin Corp.*, 268 NLRB 573 (1984). We do not apply our current deferral standard here because this case was pending as of the date we prospectively adopted that standard. See *Babcock & Wilcox Construction Co.*, 361 NLRB No. 132, slip op. at 13–14 (2014).

[2] In affirming the remedial provisions regarding adverse tax consequences and Social Security reporting requirements in the Decision and Order, we rely on *Don Chavas, LLC d/b/a Tortillas Don Chavas*, 361 NLRB No. 10 (2014). We shall also substitute a new notice in accordance with our decision in *Durham School Services*, 360 NLRB No. 85 (2014).

We also correct a typographical error in the judge's recommended Order as appended to the Decision and Order. Paragraph 1(a) is corrected to read: "Failing to provide the Union with prior notice and an opportunity to bargain over the effects of its decision to reduce the hours of full-time employees in the dietary department starting in about September 2011." 359 NLRB No. 155, slip op. at 8 (2013).

---

Dated, Washington, D.C. January 29, 2015

| | |
|---|---|
| Mark Gaston Pearce, | Chairman |
| Kent Y. Hirozawa, | Member |
| Lauren McFerran, | Member |

(SEAL)    NATIONAL LABOR RELATIONS BOARD

APPENDIX

NOTICE TO EMPLOYEES
POSTED BY ORDER OF THE
NATIONAL LABOR RELATIONS BOARD
An Agency of the United States Government

The National Labor Relations Board has found that we violated Federal labor law and has ordered us to post and obey this notice.

FEDERAL LAW GIVES YOU THE RIGHT TO

Form, join, or assist a union
Choose representatives to bargain with us on your behalf
Act together with other employees for your benefit and protection
Choose not to engage in any of these protected activities.

WE WILL NOT fail or refuse to provide SEIU Healthcare Michigan (the Union) with prior notice and an opportunity to bargain over the effects of our decision to reduce the scheduled hours of full-time employees in the dietary department.

WE WILL NOT in any like or related manner interfere with, restrain, or coerce you in the exercise of the rights listed above.

WE WILL pay Khadijah Anderson, Clondia Finley, Eartha Finley, Laura Gonzalez, Dion Luckett, Stacee Miller, John Ross, Felicia Slater, Angela Valentez, and Joanne Wood the difference between their regular weekly wages and their weekly wages after the September 2011 reduction in their scheduled hours for at least a 2-week period, with interest.

DECISIONS OF THE NATIONAL LABOR RELATIONS BOARD                     2

WE WILL on request, bargain collectively with the Union as the exclusive representative of the employees in the following appropriate unit concerning the effects of our decision to reduce the scheduled hours of dietary department employees in September 2011.

> All full-time and regular part-time nurses aides, housekeeping employees, dietary employees, laundry employees, maintenance employees, and cooks employed by Respondent at its facility located at 105 Haggerty Road, Plymouth, Michigan; but excluding registered nurses, licensed practical nursed, administrators, office clerical employees, guards and supervisors as defined in the Act, and all other employees.

> HEARTLAND-PLYMOUTH COURT MI, LLC,
> D/B/A HEARTLAND HEALTH CARE CENTER-
> PLYMOUTH COURT

The Board's decision can be found at www.nlrb.gov/case/07-CA-070626 or by using the QR code below. Alternatively, you can obtain a copy of the decision from the Executive Secretary, National Labor Relations Board, 1099 14th Street, N.W., Washington, D.C. 20570, or by calling (202) 273–1940.



NOTICE: This opinion is subject to formal revision before publication in the bound volumes of NLRB decisions. Readers are requested to notify the Executive Secretary, National Labor Relations Board, Washington, D.C. 20570, of any typographical or other formal errors so that corrections can be included in the bound volumes.

**Heartland-Plymouth Court MI, LLC d/b/a Heartland Health Care Center-Plymouth Court** *and* **SEIU Healthcare Michigan.** Case 07–CA–070626

July 15, 2013

## DECISION AND ORDER

### BY CHAIRMAN PEARCE AND MEMBERS GRIFFIN AND BLOCK

On March 12, 2013, Administrative Law Judge Ira Sandron issued the attached decision. The Respondent filed exceptions and a supporting brief, and the Acting General Counsel filed an answering brief.

The National Labor Relations Board has considered the decision and the record in the light of the exceptions and briefs and has decided to affirm the judge's rulings, findings, and conclusions,[1] and to adopt the recommended Order as modified.[2]

### AMENDED REMEDY

A remedy similar to that in *Transmarine Navigation Corp.*, 170 NLRB 389 (1968), is the standard remedy granted when an employer fails to bargain over the effects of closing a facility or otherwise removing work from the bargaining unit. *Rochester Gas & Electric Corp.*, 355 NLRB 507, 507 (2010), enfd. sub nom. *Electrical Workers Local 36 v. NLRB*, 706 F.3d 73 (2d Cir. 2013), petition for cert. filed 81 U.S.L.W. 3566 (U.S. Mar. 28, 2013) (No. 12-1178); *Stevens International*, 337 NLRB 143, 144 (2001). However, having considered the

---

[1] We agree with the judge that deferral to the arbitrator's award is not appropriate in this case because the arbitrator did not adequately consider the unfair labor practice issue presented here. See *Spielberg Mfg. Co.*, 112 NLRB 1080 (1955); *Olin Corp.*, 268 NLRB 573 (1984). As found by the judge, the issue of the Respondent's obligation to engage in effects bargaining was not raised in the arbitral hearing or in the parties' posthearing briefs to the arbitrator; nor did the arbitrator's decision address any duty to bargain issue. We further agree with the judge that Union Steward Brandi Malone's testimony at the arbitration proceeding was not sufficiently developed to show either that evidence relevant to the statutory issue before the Board was presented to the arbitrator, or that the Respondent engaged in effects bargaining. Accordingly, we find it unnecessary to pass on the judge's finding that Malone's testimony lacked foundation and was inadmissible in this proceeding.

We also agree with the judge that the Union did not waive its statutory right to bargain by failing to request effects bargaining. We note particularly that the record supports the judge's finding that Union Representative Kim Fowlkes did not learn about the September schedule change before November. It is well settled that Sec. 8(a)(5) requires effects bargaining to be conducted "in a meaningful manner and at a meaningful time . . . ." *First National Maintenance Corp. v. NLRB*, 452 U.S. 666, 681–682 (1981). Effects bargaining must occur sufficiently before actual implementation of the decision so that the union is not presented with a fait accompli. *Komatsu America Corp.*, 342 NLRB 649, 649 (2004).

In analyzing the effects bargaining allegation, we apply "one of the oldest and most familiar of Board doctrines, the clear and unmistakable waiver standard," not the "contract coverage" standard argued by the Respondent. See *Provena St. Joseph Medical Center*, 350 NLRB 808, 810 (2007). However, in considering whether the Union clearly and unmistakably relinquished its right to bargain about the effects of the Respondent's decision, we do not rely on *American Benefit Corp.*, 354 NLRB 1039 (2010), which was issued by a two-Member Board. See *New Process Steel, L.P. v. NLRB*, 130 S.Ct. 2635 (2010); *Hospital Pavia Perea*, 355 NLRB 1300, 1300 fn. 2 (2010) (recognizing that the two-Member Board "lacked authority to issue an order").

[2] We shall modify the judge's remedy to better effectuate the policies of the Act. We shall also modify his recommended Order and substitute a new notice to conform to the violations found and to the Board's standard remedial language.

Respondent's exception, we conclude that a *Transmarine* remedy modified similarly to that in *Rochester Gas* is more appropriately tailored to the violation here and will better effectuate the policies of the Act.

A *Transmarine* remedy requires an employer to bargain over the effects of its decision and to provide employees with limited backpay from 5 days after the date of the Board's decision until the occurrence of one of four specified conditions. See *Transmarine*, above at 390, as clarified in *Melody Toyota*, 325 NLRB 846, 846 (1998). The backpay requirement is "designed both to make whole the employees for losses suffered as a result of the violation and to recreate in some practicable manner a situation in which the parties' bargaining position is not entirely devoid of economic consequences for the Respondent." *Transmarine*, above at 390.

Here, the Respondent violated its obligation to provide the Union with notice and an opportunity to engage in timely bargaining about the effects of its decision to reduce the scheduled work hours of employees in the bargaining unit. As in *Rochester Gas*, although the Respondent's decision did not result in the loss of jobs, it did cause unit employees to incur economic losses. The Respondent's unfair labor practice thus deprived the Union of "an opportunity to bargain . . . at a time . . . when such bargaining would have been meaningful in easing the hardship on employees" whose hours were being curtailed. *Transmarine*, above at 389. We cannot now determine the result that timely effects bargaining would have produced. Nor would it be appropriate to order the Respondent to restore to unit employees the hours they were scheduled to work prior to the reductions, because there is no contention before us that the Respondent's decision to reduce the hours was itself unlawful.

Were we merely to order that the Respondent now engage in effects bargaining, the Union could hardly hope to obtain whatever mitigation of the employees' economic losses it might have obtained had the opportunity to bargain been offered at the time required by law. Because the Respondent has implemented the schedule reduction and thus relieved whatever pressures motivated it to decide to do so, "meaningful bargaining cannot be assured without restoring some measure of bargaining power to the Union in relation to the issue." *Rochester Gas*, above at 508.

Accordingly, in order to ensure that meaningful bargaining occurs and to effectuate the policies of the Act, we shall order the Respondent to bargain over the effects of its decision and to provide employees with a limited and conditional make-whole remedy similar to that required in *Rochester Gas*, above. Specifically, we shall order the Respondent to pay the employees who suffered economic losses as a result of its unilateral reduction in scheduled hours in September 2011 the difference between their normal weekly wages and their weekly wages after the hours reduction from 5 days after the date of this Decision and Order until the occurrence of the earliest of the following conditions: (1) the Respondent bargains to agreement with the Union on the effects of the hours reduction; (2) the parties reach a bona fide impasse in bargaining; (3) the Union fails to request bargaining within 5 business days after receipt of this Decision and Order, or to commence negotiations within 5 business days after receipt of the Respondent's notice of its desire to bargain with the Union; or (4) the Union subsequently fails to bargain in good faith. The sum paid to each employee shall not exceed the value of the difference between his or her wages before and after the reduction from the date of the reduction until the date the Respondent shall have offered to bargain in good faith. However, in no event shall the sum paid to any employee be less than the difference between his or her normal wages and postreduction wages for a 2-week period.[3] The amounts due shall be computed in accordance with *Ogle Protection Service*, 183 NLRB 682 (1970), enfd. 444 F.2d 502 (6th Cir. 1971), with interest at the rate prescribed in *New Horizons for the Retarded*, 283 NLRB 1173 (1987), compounded daily as prescribed in *Kentucky River Medical Center*, 356 NLRB No. 8 (2010). The Respondent shall file a report with the Social Security Administration allocating backpay to the appropriate calendar quarters, and shall compensate employees for any adverse tax consequences of receiving lump-sum backpay awards covering more than 1 calendar year. *Latino Express, Inc.*, 359 NLRB No. 44 (2012).

ORDER

The National Labor Relations Board adopts the recommended Order of the administrative law judge as modified below and orders that the Respondent, Heartland-Plymouth Court MI, LLC d/b/a Heartland Health Care Center-Plymouth Court, Plymouth, Michigan, shall take the action set forth in the Order as modified.

1. Substitute the following for paragraph 2(a).

"(a) Pay Khadijah Anderson, Clondia Finley, Eartha Finley, Laura Gonzalez, Dion Luckett, Stacee Miller, John Ross, Felicia Slater, Angela Valentez, and Joanne Wood the difference between their normal weekly wages and their weekly wages after the reduction in their

---

[3] We leave to compliance the determination of the difference between each affected employee's regular and postreduction wages.

scheduled hours in September 2011 for the period set forth in the remedy section of the judge's decision as amended in this decision."

2. Insert the following as paragraph 2(c) and reletter the subsequent paragraphs.

"(c) Preserve and, within 14 days of a request, or such additional time as the Regional Director may allow for good cause shown, provide at a reasonable place designated by the Board or its agents, all payroll records, social security payment records, timecards, personnel records and reports, and all other records including an electronic copy of such records if stored in electronic form, necessary to analyze the amount of backpay due under the terms of this Order."

3. Substitute the attached notice for that of the administrative law judge.

Dated, Washington, D.C.  July 15, 2013

---

Mark Gaston Pearce,                          Chairman

---

Richard F. Griffin, Jr.,                     Member

---

Sharon Block,                                Member

(SEAL)      NATIONAL LABOR RELATIONS BOARD

APPENDIX

NOTICE TO EMPLOYEES
POSTED BY ORDER OF THE
NATIONAL LABOR RELATIONS BOARD
An Agency of the United States Government

The National Labor Relations Board has found that we violated Federal labor law and has ordered us to post and obey this notice.

FEDERAL LAW GIVES YOU THE RIGHT TO

Form, join, or assist a union

Choose representatives to bargain with us on your behalf

Act together with other employees for your benefit and protection

Choose not to engage in any of these protected activities.

WE WILL NOT fail or refuse to provide SEIU Healthcare Michigan (the Union) with prior notice and an opportunity to bargain over the effects of our decision to reduce the scheduled hours of full-time employees in the dietary department.

WE WILL NOT in any like or related manner interfere with, restrain, or coerce you in the exercise of the rights listed above.

WE WILL pay Khadijah Anderson, Clondia Finley, Eartha Finley, Laura Gonzalez, Dion Luckett, Stacee Miller, John Ross, Felicia Slater, Angela Valentez, and Joanne Wood the difference between their regular weekly wages and their weekly wages after the September 2011 reduction in their scheduled hours, with interest.

WE WILL on request, bargain collectively with the Union as the exclusive representative of the employees in the following appropriate unit concerning the effects of our decision to reduce the scheduled hours of dietary department employees in September 2011.

> All full-time and regular part-time nurses aides, housekeeping employees, dietary employees, laundry employees, maintenance employees, and cooks employed by us at our facility located at 105 Haggerty Road, Plymouth, Michigan; but excluding registered nurses, licensed practical nursed, administrators, office clerical employees, guards and supervisors as defined in the Act, and all other employees.

> HEARTLAND-PLYMOUTH COURT MI, LLC D/B/A HEARTLAND HEALTH CARE CENTER-PLYMOUTH COURT

*Dynn Nick, Esq.*, for the Acting General Counsel.
*Clifford H. Nelson Jr., Esq. (Constangy, Brooks & Smith, LLC)*, for the Respondent.
*Chelsea Ditz, Esq.*, for the Charging Party.

DECISION

STATEMENT OF THE CASE

IRA SANDRON, Administrative Law Judge. This case arises out of a November 27, 2012 complaint and notice of hearing that stems from an unfair labor practice (ULP) charge that SEIU Healthcare Michigan (the Union) filed on December 13, 2011, against Heartland-Plymouth Court MI, LLC d/b/a Heartland Health Center-Plymouth Court (the Respondent).

I held a trial in Detroit, Michigan, on January 14, 2013, at which I afforded the parties full opportunity to be heard, to examine and cross-examine witnesses, and to introduce evidence.

Issue

Notwithstanding an arbitrator's award in the Respondent's favor, did the Respondent violate Section 8(a)(5) and (1) of the National Labor Relations Act (the Act) by reducing the hours

of dietary department employees in about September 2011,[1] without affording the Union prior notice and an opportunity to bargain over the effects of this conduct?[2]

### Witnesses and Credibility

Kim Fowlkes, the Union's representative at the facility at all times material, testified for the Acting General Counsel. Karen Szkutnik, the Respondent's regional human resources manager, testified on the Respondent's behalf, with her testimony limited to the circumstances surrounding the reduction in hours of the dietary department employees.

Fowlkes was only a partially reliable witness. Thus, she tended to go off track and ramble in response to questions and was often hazy when it came to providing details. She also sometimes provided conflicting testimony. Thus, Fowlkes first testified that after she heard that management was cutting hours for full-time dietary department employees, she called Acting Steward Brandi Malone and asked her to investigate the matter, but soon after testified that she told Malone to file a grievance.[3] Fowlkes first testified that at the one grievance meeting, Szutnik did all of the talking for management but later testified that Administrator Bret Lucka did participate in substantive discussion.[4]

Szkutnik appeared candid, and her limited testimony was credible. In this regard, I note that she expressly disagreed with the depiction of the events in around September as "unprecedented," as described in the Respondent's September 4, 2012 position statement.[5]

On the other hand, to the extent that Szkutnik did not testify about what was said at the grievance meeting, or in November and December telephone conversation that Fowlkes testified they had, I draw an adverse inference from the Respondent's failure to question her thereon since, as a management representative, she reasonably would be assumed to be favorably disposed to the Respondent . See *Daikichi Corp.*, 335 NLRB 622, 622 (2001); *Colorflo Decorator Products*, 228 NLRB 408, 410 (1977), enfd. mem. 583 F.2d 1289 (9th Cir. 1978). Similarly, I draw an adverse inference from the Respondent's failure to call Lucka as a witness to testify about what was said at that meeting or in the November conversation that Fowlkes testified they had, in the absence of an explanation of why he could not be present.[6] See *Champion Rivet Co.*, 314 NLRB 1097, 1099 fn. 8 (1994); *Douglas Aircraft Co.*, 308 NLRB 1217, 1217 fn. 1 (1992). Accordingly, I credit Fowlkes' unrebutted and consistent testimony on these matters. I cite the well-established trial precept that witnesses may be found partially credible. *Jerry Ryce Builders*, 352 NLRB 1262, 1262 fn. 2 (2008), citing *NLRB v. Universal Camera Corp.*, 179 F.2d 749, 754 (2d Cir. 1950), revd. on other grounds 340 U.S. 474 (1951). In this regard, the trier of fact must consider the plausibility of a witness' testimony and appropriately weigh it with the evidence as a whole. *Golden Hours Convalescent Hospitals*, 182 NLRB 796, 798–799 (1970).

### Facts

Based on the entire record, including testimony and my observations of witness demeanor, documents, and stipulations, as well as the thoughtful posttrial briefs that the Acting General Counsel and the Respondent filed, I find the following

The facility is a 109-bed healthcare operation that provides both long-term care and skilled nursing rehabilitation. The Respondent has admitted jurisdiction as alleged in the complaint, as amended without objection at trial, and I so find.

The Respondent and the Union are parties to a collective-bargaining agreement that is effective from July 8, 2011, to July 8, 2014, and covers all full-time and regular part-time nurses' aides, housekeeping employees, and cooks employed at the facility.[7] There are about 70 unit employees.

The agreement contains a broad management-rights clause in article 3 that provides, inter alia, that management has the right to determine and change starting times, quitting times, and shifts; and the size and composition of the work force; to extend the manner in which departments are operated; and to determine to what extent any work will be performed by employees.[8] Article 25, contains a "zipper clause," providing that for the life of the agreement, the parties waive the right to bargain over any subjects or matters referred to therein, "even though such subjects or matters may not have been within the knowledge of [sic] contemplation of either or both of the parties at the time they negotiated or signed this Agreement."[9]

Department budgets, prepared annually in September of the previous year, are based on a census or resident count of 90, which allows all employees to work full-time hours. However, the budget for staffing is adjusted downward when the daily census is below that figure and, if staff hours need to be cut as a result, employee seniority is used as the basis.

When Cari Mitter, director of food and nutrition at times relevant, arrived in February, the patient census was at 90, but the number gradually decreased in the fall of 2011. At that time, there were issues with the State survey and either a denial or potential denial of Medicare payments, as a result of which Administrator Lucka decided to withhold admissions, and the patient census dropped.

By late September, the daily census was down to the 60s. As a result, Mitter testified at the arbitration hearing, she decided to reduce the hours of a number of dietary employees rather than resort to layoffs. Thus, starting that month, she cut the hours of Khadijah Anderson, Clondia Finley (Finley), Eartha Finley, Laura Gonzalez, Dion Luckett, Stacee Miller, John Ross, Felicia Slater, Angela Valentez, and Joanne Wood.[10]

---

[1] All dates hereinafter occurred in 2011, unless otherwise indicated.
[2] The Acting General Counsel does not contend that the Respondent was obligated to bargain over the decision itself.
[3] Tr. 26, 30.
[4] Tr. 34, 37.
[5] Tr. 76–77. See GC Exh. 4, p. 3.
[6] The Respondent's answer states that Lucka and Director Cari Mitter no longer hold their positions as set forth in the complaint, but we do not know whether they currently encumber other management or supervisory positions with the Respondent, or any reasons why they could not have been available to testify.
[7] See Jt. Exh. 2, p. 58, et seq.; GC Exh. 3.
[8] Jt. Exh. 2, p. 62.
[9] Id. at 82.
[10] Id. at 23.

Finley's bi-monthly hours were reduced from 80 to between 54 and 60.

Steward Brandi Malone testified at the arbitration hearing that after the reduction in Finley's hours, she met with "management" and worked out an agreement concerning Eartha Finley, but not Finley. She could not recall the details of such agreement and offered no specifics of any of her conversations with "management." Her testimony was somewhat unclear, but agreements apparently were reached at times uncertain on at least most of the dietary department employees other than Finley.

In November, Slater informed Fowlkes that, going back to approximately September, full-time dietary workers at the facility were having their hours cut. Fowlkes said that she would investigate and, that afternoon, she called Lucka, who responded that he knew nothing about it and that this was the first he had heard about it.[11] Right after that, she called Szkutnik, who told her that she had "no knowledge of anything."[12]

A day or two later, Fowlkes called Malone. As noted earlier, Fowlkes' testimony did not make it clear whether she asked Malone to further investigate or to file a class action grievance.[13]

In any event, a class action grievance was filed on November 9, 2011, alleging that the Respondent's reduction of hours for full-time employees violated several articles of the collective-bargaining agreement.[14]

A step 3 grievance meeting was held in December 2011 in Lucka's office. Fowlkes, Slater, and Finley represented the Union; Lucka and Szkutnik (and one other unidentified individual) represented the Respondent. I credit Fowlkes' unrebutted account.

Fowlkes argued that it was wrong to cut full-time workers' hours, those of Finley in particular, and not those of part-time employees, and for the Respondent to hire new employees at the same time. She complained that management had not told her that hours were being cut.

Szkutnik responded that the patient census had gone down from approximately 90 to approximately 60, that this had never previously occurred, that the facility was losing money, and that the State could shut down the facility. She offered to provide documentation. Fowlkes had never before heard management advance these justifications for the cuts in hours.

Szkutnik offered Finley a split shift to maintain her full hours; come in the morning and then return in the afternoon. Fowlkes rejected this proposal.

On December 19, Fowlkes and Szkutnik had a phone conversation. I credit Fowlkes' uncontroverted testimony that Szkutnik repeated her offer that Finley come in the morning and then return in the afternoon, thus working a split shift. Fowlkes replied that Finley did not want this.

The next day, Szkutnik sent Fowlkes an email confirming that Fowlkes had stated that the Union rejected the Respondent's proposed solutions and would proceed with arbitration.[15] Later that day, Fowlkes sent Szkutnik an email response that the latter's proposed resolution made no sense and that the Union would drop all charges and settle the issue if the employees got back their full-time hours.[16]

Neither party made any further proposals as far as settling the grievance. The Union filed a charge on December 13. On January 17, 2012, the Regional Director deferred further proceedings to the grievance/arbitration process, as per *Collyer Insulated Wire*, 192 NLRB 837 (1971), and *United Technologies Corp.*, 268 NLRB 557 (1984).[17] The correctness of that determination is not before me.

### The Arbitration Hearing and Award

On June 6, 2012, Arbitrator Paul E. Glendon conducted a hearing in Livonia, Michigan. At the outset, both parties agreed that the grievance concerned contract interpretation, more specifically, whether the Respondent violated the agreement by reducing the working hours of full-time employees.[18] I need not detail the contract provisions at issue, other than to note that the Respondent raised the management-rights language in article 3.

The sole issue, as the arbitrator framed and decided it in his August 1, 2011 award, was whether the Respondent violated the collective-bargaining agreement by reducing Finley's regular hours below 8 hours per day and 80 per pay period due to a major continuing drop in the resident census.[19] He found for the Respondent and denied the grievance but did not address the Respondent's request that he recommend dismissal of the ULP charge alleging a unilateral change in violation of the Act.[20] In fact, the word "bargaining" appears only once in his decision (R. Exh. 1, p. 3) in the context of the Respondent's contention that the Union was trying to get in arbitration what it had been unable to achieve in bargaining. Neither his decision nor the Respondent's and the Union's briefs mentioned anything about effects bargaining.[21]

Nothing in the record reflects that the Union ever specifically requested effects bargaining as opposed to bargaining over the decision itself.

### Conclusions

As a starting point for analysis, an employer must notify and consult with the union representing its employees before imposing unilateral changes in wages, hours, and terms and conditions of employment. See *NLRB v. Katz*, 369 U.S. 736, 747 (1962). These are considered mandatory subjects of bargaining, provided a change is "material, substantial, and significant." *Flambeau Airmold Corp.*, 334 NLRB 165, 165 (2001), citing *Alamo Cement Co.*, 281 NLRB 737, 738 (1986). Reduc-

---

[11] Tr. 24. Fowlkes' uncontroverted testimony.
[12] Tr. 25. Fowlkes' uncontroverted testimony.
[13] Tr. 28, 30.
[14] Jt. Exh. 2, p. 48. I draw no inferences from the fact that Slater signed in the steward signature box, even though Fowlkes testified that Slater never served as a steward or acting steward. Indeed, the Respondent never claimed that this invalidated the grievance.
[15] GC Exh. 2.
[16] GC Exh. 3.
[17] R. Exh. 4
[18] Jt. Exh. 2, p. 3, et seq.
[19] R. Exh. 1, p. 1.
[20] See R. Exh. 3, p. 35.
[21] R. Exhs. 2, 3.

ing employees' work hours clearly meets such criteria. See *USC University Hospital*, 358 NLRB No. 132 (2012); *Best Century Buffet, Inc.*, 358 NLRB No. 23 (2012). Therefore, absent other circumstances, an employer violates Section 8(a)(5) and (1) by making unilateral changes therein.

I will now discuss the applicable law on effects bargaining. The Acting General Counsel does not allege that the Respondent had an obligation to bargain over its decision to reduce the hours of dietary department employees but was nonetheless obliged to bargain over the effects of that decision. The Acting General Counsel has correctly cited *Good Samaritan Hospital*, 335 NLRB 901 (2001), review dismissed by agreement sub nom. 2002 WL 31016553 (D.C. Cir. 2002) (not reported in F.3d), for the proposition that effects bargaining is required even where the employer has no obligation to bargain about the decision itself because of contractual management-rights language. See also *KIRO, Inc.*, 317 NLRB 1325, 1327 (1995), citing *First National Maintenance Corp. v. NLRB*, 452 U.S. 666, 681–682 (1981). In *First National Maintenance Corp.*, the Court stated (at 682):

> [B]argaining over the effects of a decision must be conducted in a meaningful manner and at a meaningful time, and the Board may impose sanctions to insure its adequacy. A Union, by pursuing such bargaining rights, may achieve valuable concessions from an employer engaged in a partial closing. It also may secure in contract negotiations provisions implementing rights to notice, information, and fair bargaining . . . .

The Respondent cites *Enloe Medical Center v. NLRB*, 433 F.3d 834 (D.C. Cir. 2005), for the opposite result, but "The Board has a long established policy of refusing to acquiesce in the adverse decisions of the appellate courts" that are contrary to Board law. *Provena St. Joseph Medical Center*, 350 NLRB 808, 814 (2007), and I am bound by Board precedent.

The Respondent argues that the Union waived the right to bargain over effects by express provisions in the collective-bargaining agreement, to wit, the management-rights and "zipper" clauses, as well as by its conduct in not earlier specifically requesting such.

As to the first ground, waiver of a bargaining right from contractual language is not lightly inferred, and an employer contending this bears the burden of demonstrating that the union has clearly and unmistakably relinquished such right. *Metropolitan Edison Co. v. NLRB*, 460 U.S. 693, 708 (1983); *American Benefit Corp.*, 354 NLRB 1039 (2010) (management-rights and zipper clauses, and other contractual provisions); *Provena St. Joseph Medical Center*, above at 810–812 (management-rights clause).

Neither the management-rights nor "zipper" clauses say anything whatsoever about the effects of management's decisions or the Union's rights to bargain there over. Indeed, in cases cited above, including *Good Samaritan Hospital*, above, the Board found that the employer had an obligation to bargain over effects even though language in the management-rights clause constituted a waiver of the union's right to bargain over the decision itself. Although the Respondent's brief is creative in attempting to distinguish this case from *Good Samaritan Hospital*, I find such arguments to be unpersuasive. Analyzing the precise language of the management-rights clause was not at the crux of the Board's decision; rather, the Board's focus was on the difference in the clause's impact on the employer's obligation to engage in effects bargaining as opposed to decisional bargaining.

With regard to the second ground, asserted waiver by the union's conduct, an employer has the same burden, of showing that the union "clearly intend[ed], express[ed], and manifest[ed] a conscious relinquishment" of its right to bargain. *Intermountain Rural Electric Assn.*, 305 NLRB 783, 786 (1991), enfd. 984 F.2d 1562 (10th Cir. 1993); see also *Regal Cinemas, Inc. v. NLRB*, 317 F.3d 300, 314 (D.C. Cir. 2003). The Union filed a grievance shortly after it learned of the Respondent's cutting the hours of dietary department employees and, at all times during the grievance-arbitration proceedings, focused on what it deemed the Respondent's obligation to bargain over the decision itself. Nothing in the arbitration proceeding, including the posthearing briefs, suggests that the Union (or the Respondent, for that matter) even considered, let alone addressed, the alternative of effects bargaining if the arbitrator denied the grievance. Although the Union never specifically requested effects bargaining per se, such a request was implicit in its grievance and its request that the status quo ante be restored. See *Rochester Gas & Electric Corp.*, 355 NLRB 507, 507 (2010), enfd. sub nom. *Electrical workers Local 36 v. NLRB*, 706 F.3d 73 (2d Cir. 2013).

In these circumstances, I cannot find that the Respondent has met its burden of establishing that the Union "clearly intend[ed], express[ed], and manifested[ed] a conscious relinquishment" of its right to engage in effects bargaining.

The Respondent further contends that Malone's testimony at the arbitration hearing—reinforced by the Union's opening statement there—establish that the Respondent did in fact engage in effects bargaining with Malone and worked out arrangements on everyone other than Finley. The fundamental flaw with this argument is that the record is totally devoid of any foundational requirements necessary for admissible evidence in a formal proceeding. Nowhere did Malone even name the "management" representative(s) with whom she spoke, how many meetings they had, where they occurred, who was present, or who said what. In this regard, she offered no specifics of any conversations. The Respondent did not call her as a 611(c) witness or call Mitter, who the Respondent suggests was the management representa-tive involved. Nor did the Respondent proffer any reason why it could not produce Malone or Mitter as witnesses to bolster its defense that it did engage in effects bargaining. The result was that Fowlkes was the only witness who testified, without controversion, about communications that the Union had with management over the reductions in hours.

Fowlkes did not learn of the reduction in hours until November, through unit employees, and management did not confirm this change until the parties' December grievance meeting. Accordingly, the Union was deprived of the opportunity to engage in effects bargaining at a point where it might have been able to secure ameliorating circumstances for the affected employees.

Finally, the Respondent contends that I should defer to the arbitrator's award, whereas the Acting General Counsel argues that deferral is inappropriate because the contractual and ULP issues were not factually parallel, the arbitrator was not presented generally with the facts relevant to resolving the ULP, and the arbitrator's decision was palpably wrong/repugnant to the Act.

In *Olin Corp.*, 268 NLRB 573 (1984), the Board reaffirmed its commitment to the deferral standards set forth in *Spielberg Mfg. Co.*, supra, to wit, that the proceedings appear to have been fair and regular, all parties agreed to be bound, and the decision of the arbitrator was not clearly repugnant to the purposes and policies of the Act. The Board also clarified its position with respect to the requirement under *Raytheon Corp.*, 140 NLRB 883 (1963), that the arbitrator must have considered the ULP issue, by holding that this requirement is satisfied if (1) the contractual issue is factually parallel to the ULP issue, and (2) the arbitrator was presented generally with the facts relevant to resolving the ULP. 268 NLRB at 574.

The burden of proof is on the party who opposes deferral. *Martin Redi-Mix*, 274 NLRB 559, 560 (1985); *Olin Corp.*, above at 574. One way that this burden can be met is by showing that the arbitrator did not adequately consider issues relevant to the Act. *Airborne Freight Corp.*, 343 NLRB 580, 580 (2004); *Dick Gidron Cadillac*, 287 NLRB 1107, 1111 (1988), enfd. mem. 862 F.3d 304 (2d Cir. 1988). However, the arbitrator need not have specifically addressed or considered the law related to the ULP, if the evidence necessary for a determination of the merits of the ULP charge was essentially the same evidence before the arbitrator. *Andersen Sand & Gravel Co.*, 277 NLRB 1204, 1205 (1985). Another means, which embodies the *Andersen* caveat, is by establishing that the facts relevant to the ULP were not generally presented to the arbitrator during the proceeding. See *Turner Construction. Co.*, 339 NLRB 451, 451 fn. 2 (2003); *Martin Redi-Mix*, above at 560.

Here, the issue of effects bargaining was not raised either at the arbitration hearing or in the parties' posthearing briefs, and nothing whatsoever in the arbitrator's award purported to address effects bargaining, let alone any kind of bargaining. The focus of the evidence presented to him related to the Respondent's decision to reduce the hours of dietary department employees and whether the Respondent had the right to do so under the contract.

That the Respondent's actual bargaining with the Union was a peripheral matter at the arbitration hearing is best reflected by the extremely limited testimony that the parties presented thereon. Thus, the only witness who testified on any postchange interactions between the Respondent and the Union was Malone, whose testimony was not sufficiently developed during the arbitration hearing to constitute admissible evidence in a formal proceeding or, it follows, to establish that the parties engaged in any "bargaining." The Union did not call Fowlkes, and the Respondent did not call Luckas or Szkutnik to testify about their communications after the changes in hours were instituted. Mitter testified only about the circumstances behind the decision to reduce the hours, not on anything related to bargaining. There can be no doubt that the evidence pertinent to effects bargaining was not meaningfully or fully presented at the arbitration hearing.

I conclude, therefore, that the scope of the arbitration hearing was limited to contractual interpretation and that the evidence necessary for a resolution of the instant ULP was not the same evidence that was presented to, and considered by, the arbitrator. Therefore, the issue of whether the Respondent violated its duty to engage in effects bargaining remains litigable before the Board. See *ABF Freight System*, 304 NLRB 585, 591 fn. 5 (1991); *Dick Gidron Cadillac*, above at 1111; *Olin Corp.*, supra at 574. In light of this conclusion, I need not address the Acting General Counsel's argument that the award was repugnant to the Act.

In summary, I conclude that the Respondent's failure to provide the Union with prior notice and an opportunity to bargain over the effects of the reduction in hours violated Section 8(a)(5) and (1) of the Act.

### CONCLUSIONS OF LAW

1. The Respondent is an employer engaged in commerce within the meaning of Section 2(2), (6), and (7) of the Act.

2. The Union is a labor organization within the meaning of Section 2(5) of the Act.

3. By the following conduct, the Respondent has engaged in unfair labor practices affecting commerce within the meaning of Section 2(6) and (7) of the Act and violated Section 8(a)(5) and (1) of the Act: Failed to afford the Union prior notice and an opportunity to bargain over the effects of its decision to reduce the hours of full-time employees in the dietary department starting in about September 2011.

### REMEDY

Because I have found that the Respondent has engaged in certain unfair labor practices, I find that it must be ordered to cease and desist and to take certain affirmative action designed to effectuate the policies of the Act.

The standard remedy in effects bargaining cases is a *Transmarine*[22] remedy. *Rochester Gas & Electric Corp.*, 355 NLRB 507, 508 (2010); *AG Communications Systems Corp.*, 350 NLRB 168, 173 (2007), petition for review denied sub nom. 563 F.3d 418 (9th Cir. 2009). This includes requiring the employer to bargain over the effects of the decision and to make employees whole until the earliest of the following conditions occurs: (1) the parties bargain to agreement over the effects of the change; (2) the parties reach a bargaining impasse; (3) the union fails to request bargaining within 5 days after receipt of the Board's decision, or to begin negotiations within 5 days after receiving the employer's notice of its desire to bargain; or (4) the union fails to bargain in good faith. Further, the backpay amount paid to any employee must not be less than 2 weeks.

The rationale behind this enhanced remedy is that the respondent's ULP deprived the union of "an opportunity to bargain ... at a time prior to [implementation of the decision] when such bargaining would have been meaningful in easing the hardship on employees...." 170 NLRB at 389. Concomi-

---

[22] *Transmarine Navigation Corp.*, 170 NLRB 389 (1968).

tantly, had the respondent engaged in timely effects bargaining, the union may have been able to secure additional benefits for employees. See *Live Oak Skilled Care & Manor*, 300 NLRB 1040, 1042 (1990) ("[I]t is reasonable to require that 'the employees whose statutory rights were invaded by reason of the Respondent's unlawful . . . action, and who may have suffered losses in consequences thereof, be reimbursed for such losses until such time as the Respondent remedies it violation by doing what it should have done in the first place'" (citations omitted)). In sum, an employer should not benefit from having failed to engage in timely effects bargaining.

Effects bargaining cases typically involve an employer's failure to bargain over the effects of closing a facility or otherwise removing bargaining work. See *Rochester Gas & Electric*, above. However, a *Transmarine* remedy may be ordered when a unilateral change does not result in a loss of jobs but otherwise causes economic losses to unit employees. Thus, in *Rochester Gas & Electric*, above, the Board found appropriate a *Transmarine*-type remedy where the employer had made a unilateral change in the vehicle benefit that it afforded employees, resulting in increased commuting costs. See also *Good Samaritan Hospital*, supra (modifying the determination of how many employees would be on a given shift).

Accordingly, I will order that employees be made whole as per the above-described *Transmarine* remedy. Backpay shall be computed as prescribed in accordance with *F. W. Woolworth Co.*, 90 NLRB 289 (1950), with interest as set forth in *New Horizons for the Retarded*, 283 NLRB 1173 (1987), compounded daily as prescribed in *Kentucky River Medical Center*, 356 NLRB No. 8 (2010). The Respondent shall file a report with the Social Security Administration allocating backpay to the appropriate calendar quarters, and shall compensate employees for any adverse tax consequences of receiving lump-sum backpay awards covering more than 1 calendar year. *Latino Express, Inc.*, 359 NLRB No. 44 (2012).

The *Transmarine* remedy does not include restoration of the status quo ante, as the Acting General Counsel requests, and I will not include such in my order.

On these findings of fact and conclusions of law and on the entire record, I issue the following recommended[23]

### ORDER

The Respondent, Heartland-Plymouth Court MI, LLC d/b/a Heartland Health Care Center-Plymouth Court, Plymouth, Michigan, shall

1. Cease and desist from

(a) Failing to provide the Union with prior notice and an opportunity to bargain over the effects of its decision to reduce the in about September 2011.

(b) In any like or related manner interfering with, restraining, or coercing employees in the exercise of the rights guaranteed them by Section 7 of the Act.

2. Take the following affirmative action necessary to effectuate the policies of the Act.

(a) Make the following dietary department employees whole for all losses they may have suffered, in the manner set forth in the remedy section of this decision: Khadijah Anderson, Clondia Finley, Eartha Finley, Laura Gonzalez, Dion Luckett, Stacee Miller, John Ross, Felicia Slater, Angela Valentez, and Joanne Wood.

(b) On request, meet and bargain with the Union over the effects of its decision to reduce the hours of employees in the dietary department and, if an understanding is reached, embody the understanding in a signed agreement.

(c) Within 14 days after service by the Region, post at its facility in Plymouth, Michigan, copies of the attached notice marked "Appendix."[24] Copies of the notice, on forms provided by the Regional Director for Region 7, after being signed by the Respondent's authorized representative, shall be posted by the Respondent and maintained for 60 consecutive days in conspicuous places at all facilities where the unlawful policy has been or is in effect, including all places where notices to employees are customarily posted. In addition to physical posting of paper notices, notices should be distributed electronically, such as by email, posting on an intranet or an internet site, and/or other electronic means, if the Respondent customarily communicates with its employees by such means. Reasonable steps shall be taken by the Respondent to ensure that the notices are not altered, defaced, or covered by any other material. In the event that, during the pendency of these proceedings, the Respondent has gone out of business or closed the facility involved in these proceedings, the Respondent shall duplicate and mail, at its own expense, a copy of the notice to all current employees and former employees employed by the Respondent at any time since September 1, 2011.

(d) Within 21 days after service by the Region, file with the Regional Director a sworn certification of a responsible official on a form provided by the Region attesting to the steps that the Respondent has taken to comply.

Dated, Washington, D.C. March 12, 2013.

### APPENDIX
NOTICE TO EMPLOYEES
POSTED BY ORDER OF THE
NATIONAL LABOR RELATIONS BOARD
An Agency of the United States Government

The National Labor Relations Board has found that we violated Federal labor law and has ordered us to post and obey this notice.

FEDERAL LAW GIVES YOU THE RIGHT TO

Form, join, or assist a union
Choose representatives to bargain with us on your behalf

---

[23] If no exceptions are filed as provided by Sec. 102.46 of the Board's Rules and Regulations, the findings, conclusions, and recommended Order shall, as provided in Sec. 102.48 of the Rules, be adopted by the Board and all objections to them shall be deemed waived for all purposes.

[24] If this Order is enforced by a judgment of a United States court of appeals, the words in the notice reading "Posted by Order of the National Labor Relations Board" shall read "Posted Pursuant to a Judgment of the United States Court of Appeals Enforcing an Order of the National Labor Relations Board."

HEARTLAND HEALTH CARE CENTER-PLYMOUTH COURT                                  9

Act together with other employees for your benefit and protection

Choose not to engage in any of these protected activities.

SEIU Healthcare Michigan (the Union) represents our full-time and regular part-time nurses' aides, housekeeping employees and cooks (unit employees).

WE WILL NOT fail to provide the Union with prior notice and an opportunity to bargain over the effects of decisions that we make to reduce the hours of full-time unit employees, or otherwise exercise our right to make changes under our collective-bargaining agreement with the Union.

WE WILL NOT in any like or related manner interfere with, restrain, or coerce you in the exercise of the rights listed above.

WE WILL, on request, meet and bargain with the Union over the effects of our decision to reduce the hours of full-time employees in the dietary department starting in about September 2011.

WE WILL pay Khadijah Anderson, Clondia Finley, Eartha Finley, Laura Gonzalez, Dion Luckett, Stacee Miller, John Ross, Felicia Slater, Angela Valentez, and Joanne Wood any wages and other benefits they lost, with interest, for the period set forth in the remedy section of this decision.

> HEARTLAND-PLYMOUTH COURT MI, LLC D/B/A HEARTLAND HEALTH CARE CENTER-PLYMOUTH COURT

# Exhibit B

3216670.1

## Certificate of Parties and Amici
## And List of Parties Served

The following parties and amici participated in the proceeding before the National Labor Relations Board for which Heartland Health Care Center – Plymouth Court now files its Petition for Review:

>Dynn Nick
>Attorney
>National Labor Relations Board
>Region 7
>477 Michigan Avenue
>Room 300
>Detroit, MI 48226-2569
>dynn.nick@nlrb.gov
>
>Mark Raleigh
>Chief of Staff
>SEIU Healthcare Michigan
>2604 Fourth Street
>Detroit, MI 48201
>mark.raleigh@seiuhcmi.org
>
>Brenda D. Robinson, Esq.
>SEIU Healthcare Michigan
>2604 Fourth Street
>Detroit, MI 48201
>Brenda.Robinson@seiuhealthcaremi.org

Accordingly, Petitioner has on this date, February 12, 2015, served a copy of its Petition for Review on the persons identified above, as well as on the Assistant General Counsel for the National Labor Relations Board:

>Linda Dreeben
>Deputy Associate General Counsel
>National Labor Relations Board
>1099 14th Street, NW
>Washington, D.C. 20570

# Exhibit C

3216670.1

## Corporate Disclosure Statement

Pursuant to Circuit Rule 26.1, Heartland Plymouth Court MI, LLC, d/b/a Heartland Health Care Center – Plymouth Court, certifies that it is a wholly owned subsidiary of HCR IV Healthcare, LLC, which is a wholly owned subsidiary of HCR III Healthcare, LLC, which is a wholly owned subsidiary of HCR II Healthcare, LLC, which is a wholly owned subsidiary of HCR Healthcare, LLC, which is a wholly owned subsidiary of ManorCare, Inc., which is a wholly owned subsidiary of HCR ManorCare Heartland, LLC, which is a wholly-owned subsidiary of HCR ManorCare Operations II, LLC, which is a wholly-owned subsidiary of HCR ManorCare, Inc. None of these companies is publicly traded.