**RECORD NOS. 15-1034(L); 15-1045**

**ORAL ARGUMENT HAS NOT YET BEEN SCHEDULED**

In The
# United States Court of Appeals
For The District of Columbia Circuit

## HEARTLAND PLYMOUTH COURT MI, LLC, doing business as Heartland Health Care Center – Plymouth Court,

***Petitioner,***

**v.**

## NATIONAL LABOR RELATIONS BOARD,

***Respondent.***

**ON PETITION FOR REVIEW FROM**
**THE NATIONAL LABOR RELATIONS BOARD**

## BRIEF OF PETITIONER

**Charles P. Roberts, III**
**CONSTANGY, BROOKS, SMITH**
**& PROPHETE, LLP**
**100 North Cherry Street, Suite 300**
**Winston-Salem, North Carolina 27101**
**(336) 721-1001**

**Clifford H. Nelson, Jr.**
**CONSTANGY, BROOKS, SMITH**
**& PROPHETE, LLP**
**230 Peachtree Street, Suite 2400**
**Atlanta, Georgia 30303**
**(404) 525-6955**

***Counsel for Petitioner***

THE LEX GROUP[DC] ♦ 1825 K Street, N.W. ♦ Suite 103 ♦ Washington, D.C. 20006
(202) 955-0001 ♦ (800) 856-4419 ♦ Fax: (202) 955-0022 ♦ www.thelexgroup.com

UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA
Nos. 15-1034 and 15-1045

| | |
|---|---|
| HEARTLAND PLYMOUTH COURT MI, LLC, d/b/a HEARTLAND HEALTH CARE CENTER – PLYMOUTH COURT | ) |
| Petitioner | ) |
| v. | ) |
| NATIONAL LABOR RELATIONS BOARD, | ) |
| Respondent | ) |

**PROVISIONAL CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES**

Pursuant to Circuit Rule 28(a)(1) of this Court's rules, counsel for Heartland Health Care Center – Plymouth Court certifies the following:

**A. Parties And Amici**

1. Heartland Plymouth Court MI, LLC, d/b/a Heartland Health Care Center – Plymouth Court was the Respondent in the underlying proceedings before the NLRB. It is the Petitioner before this Court.

2. SEIU Healthcare Michigan was the Charging Party in the underlying proceedings before the NLRB. The Union has not at this time made any motion to intervene in this proceeding.

3. National Labor Relations Board (Board) is the Respondent before this Court.

4. There are no amici in this matter.

**B. Rulings Under Review**

Decision and Order of National Labor Relations Board in *Heartland Healthcare Center – Plymouth Court,* 362 NLRB No. 3 (January 29, 2015) and Decision and Order of National Labor Relations Board in *Heartland Healthcare Center – Plymouth Court,* 359 NLRB No. 155 (July 15, 2013)

**C. Related Cases**

The Board's 2013 Decision and Order (359 NLRB No. 155) was the subject of a petition for review in this Court, No. 13-1227. By order of the Court dated July 24, 2013, the case was held in abeyance pending further order of the Court. By order of the Court dated August 26, 2014, the case was dismissed, and the matter was returned to the Board for further consideration. There are no other related cases pending in any court.

So certified, this 6th day of May, 2015.

/s/ Charles P. Roberts III

Constangy, Brooks, Smith & Prophete, LLP
Suite 300, 100 N. Cherry Street
Winston-Salem, NC 27101
Telephone: 336-721-6852
Facsimile: 336 748-9112
croberts@constangy.com

# TABLE OF CONTENTS

**Page**


CERTIFICATE AS TO PARTIES, RULINGS AND RELATED CASES ..............i

TABLE OF CONTENTS ........................................................................ iii

TABLE OF AUTHORITIES ......................................................................v

GLOSSARY ...........................................................................................ix

JURISDICTIONAL STATEMENT .........................................................1

STATEMENT OF ISSUES ......................................................................3

PERTINENT STATUTES .......................................................................3

STATEMENT OF CASE .........................................................................3

Procedural History .................................................................................3

Evidentiary Facts ....................................................................................5

A. The Bargaining Relationship And Collective Bargaining Agreement ....................................................................................5

B. The Reduction In Hours ...............................................................7

C. The Arbitration ..........................................................................10

SUMMARY OF ARGUMENT .............................................................11

STATEMENT OF STANDING ............................................................14

ARGUMENT ........................................................................................14

Standard Of Review ..............................................................................14

Discussion Of Issues ..............................................................................16

A. The CBA Covered The Subject Of Employee Hours. The Union's Statutory Bargaining Rights Have Been Fully Exercised. The Board Erred In Applying Its Waiver Analysis ....... 16

B. The Arbitrator's Decision Is Determinative Of This Contractual Dispute. Deferral Is Required ....... 22

C. The Union Never Made A Request To Bargain Over The Effects Of The Decision. Alternatively, The Respondent Satisfied Its Effects Bargaining Obligation ....... 30

D. The Board's Limited Backpay Remedy Constitutes An Abuse Of Discretion ....... 33

CONCLUSION ....... 34

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF FILING AND SERVICE

ADDENDUM

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Adams Dairy Co.*,
147 NLRB 1410 (1964) ........................................................................26

*Allentown Mack Sales and Service, Inc. v. NLRB*,
522 U.S. 359 (1998)..........................................................................15

*Aramark Services, Inc.*,
344 NLRB 549 (2005) ........................................................................24

*Babcock & Wilcox Construction Co.*,
361 NLRB No. 132 (2014) ..................................................................23

*Bath Marine Draftsmen's Assoc. v. NLRB*,
475 F.3d 14 (1st Cir. 2007)..................................................................16

*Bay Shipbuilding Corp.*,
251 NLRB 809 (1980) ........................................................................29

*Bridon Cordage, Inc.*,
329 NLRB 258 (1999) ........................................................................34

*Butynsky v. Springfield Terminal Railway Co.*,
592 F.3d 272 (1st Cir. 2010) ................................................................31

*CBS Corp.*,
326 NLRB 861 (1998) ........................................................................22

*Chicago Tribune Co. v. NLRB*,
974 F.2d 933 (7th Cir. 1992) ................................................................16

*Cleveland Construction, Inc. v. NLRB*,
44 F.3d 1010 (D.C. Cir. 1995)..............................................................16

**Chief Authorities are Designated by an Asterisk.*

*Collyer Insulated Wire*,
192 NLRB 837 (1971) ........................................................................25

*Dennison National Co.*,
296 NLRB 169 (1989) ...................................................................28, 29

*Dep't of Navy v. FLRA*,
962 F.2d 48 (D.C. Cir. 1992)...........................................................17

**Enloe Medical Center v. NLRB*,
433 F.3d 834 (D.C. Cir. 2005)................................. 12, 15, 16, 18, 19, 20, 32

*Fibreboard Corp. v. NLRB*,
379 U.S. 203 (1964)........................................................................26

*First National Maintenance Corp. v. NLRB*,
452 U.S. 666 (1981)....................................................................26, 32

*Good Samaritan Hospital*,
335 NLRB 901 (2001) ......................................................................34

**GTE Automatic Electric, Inc.*,
261 NLRB 1491 (1982) ....................................................................22

*International Transportation Service, Inc. v. NLRB*,
449 F.3d 160 (D.C. Cir. 2006)...........................................................15

**Komatsu America Corp.*,
342 NLRB 649 (2004) ..................................................................32, 33

*Kvaerner Philadelphia Shipyard, Inc.*,
347 NLRB No. 36 (2006) ..................................................................24

*Metropolitan Edison Co. v. NLRB*,
460 U.S. 693 (1983).........................................................................21

*Metropolitan Teletronics Corp.*,
279 NLRB 957 (1986), *enf'd*,
819 F.2d 1130 (2d Cir. 1987) ..............................................................32

*NLRB* v. *Noel Canning*,
134 S. Ct. 2550 (2014)....................................................................................2, 5

*NLRB* v. *Royal Plating & Polishing Co.*,
350 F.2d 191 (3d Cir. 1965) ...........................................................................26

*NLRB* v. *Thompson Transport Co.*,
406 F.2d 698 (10th Cir. 1969) ........................................................................26

*NLRB* v. *Transmarine Navigation Co.*,
380 F.2d 933 (9th Cir. 1967) ....................................................................26, 34

**NLRB* v. *United States Postal Service*,
8 F.3d 832 (D.C. Cir. 1993)...................................................................11, 12, 17

**Olin Corp.*,
268 NLRB 573 (1984) ........................................................................23, 24, 29

*Ozark Trailers, Inc.*,
161 NLRB 561 (1966) ......................................................................................26

*Packaging Techniques, Inc.*,
317 NLRB 1252 (1995) ......................................................................................31

*Pepsi-Cola Bottling Co.*,
145 NLRB 785 (1964) ......................................................................................26

*Radioear Corp.*,
214 NLRB 362 (1974) ......................................................................................22

*Smurfit-Stone Container Corp.*,
344 NLRB 658 (2005) ......................................................................................29

*Southern California Edison*,
310 NLRB 1229 (1993), *rev. denied*,
39 F.3d 1210 (D.C. Cir. 1994)..........................................................................29

**Spielberg Manufacturing Corp.*,
112 NLRB 1080 (1955) ......................................................................................23

*Titanium Metals Corp. v. NLRB*,
392 F.3d 439 (D.C. Cir. 2004) ........ 15

*Town & Country Manufacturing Co.*,
136 NLRB 1022 (1962), *enf'd*,
316 F.2d 846 (5th Cir. 1963) ........ 25

*Transmarine Navigation Corp.*,
170 NLRB 389 (1968) ........ 34

**United Steelworkers of America v. Warrior & Gulf Navigation Co.*,
363 U.S. 574 (1960) ........ 27, 28, 31

*United Steelworkers v. Enterprise Wheel & Car Corp.*,
363 U.S. 593 (1960) ........ 15

*Utility Workers Union of America, Local 246 v. NLRB*,
39 F.3d 1210 (D.C. Cir. 1994) ........ 15

*Vincent Industrial Plastics, Inc. v. NLRB*,
209 F.3d 727 (D.C. Cir. 2000) ........ 15

**STATUTES**

29 U.S.C. §§ 150, *et. seq.* ........ 1

29 U.S.C § 158(a)(1) ........ 1, 2, 3, 4, 5, 14

29 U.S.C § 158(a)(5) ........ 1, 2, 3, 4, 5, 14

29 U.S.C. § 152(2) ........ 14

29 U.S.C. § 160(b) ........ 1

29 U.S.C. § 160(e) ........ 3

29 U.S.C. § 160(f) ........ 2, 3, 14

## GLOSSARY

| | |
|---|---|
| SEIU Healthcare Michigan | "Union" |
| Heartland-Plymouth Court MI, LLC | "Heartland" or "Company" |
| National Labor Relations Act | "Act" |
| National Labor Relations Board | "Board" |
| Administrative Law Judge Ira Sandron | "ALJ" |
| Collective Bargaining Agreement | "CBA" |

## JURISDICTIONAL STATEMENT

This case arises out of an unfair labor practice charge filed on December 13, 2011[1] by SEIU Healthcare Michigan ("Union"). This charge alleged that Heartland-Plymouth Court MI, LLC ("Heartland" or "Company") violated the National Labor Relations Act, as amended, ("Act"), 29 U.S.C. §§ 150, *et. seq.*, by making "unilateral changes to the working terms and conditions of the employees." (JA 8).[2] The National Labor Relations Board ("Board"), through its Regional Director, investigated these charges, and, pursuant to section 10(b) of the Act, 29 U.S.C. § 160(b), issued a complaint on November 27, 2012, alleging that Heartland had violated §§ 8(a)(1) and (5) of the Act, 29 U.S.C §§ 158(a)(1), (5), by refusing to bargain over the effects of a decision to reduce employee hours. (JA 9-13).

Heartland filed a timely answer on December 10, 2012. (JA 14-20). A hearing was held before Administrative Law Judge Ira Sandron ("ALJ") on January 15, 2013, and on March 12, 2013, ALJ Sandron issued a proposed decision and order recommending that the Board find that Heartland violated the Act as alleged. (JA 502-514). Heartland filed timely exceptions to the ALJ's decision with the Board on April 16, 2013. (JA 515-521). On July 15, 2013, a panel of the

---

[1] All dates are 2011 unless otherwise indicated.

[2] References to the Joint Appendix are designated as "JA" followed by the appropriate page number(s).

Board—consisting of Chairman Pearce and Members Griffin and Block—issued its initial Decision and Order finding that Heartland had violated sections 8(a)(1) and (5) by refusing to bargain over the effects of its decision to reduce employee hours. (JA 522-530).

Heartland subsequently sought review of the Board's order in this Court. The case (No. 13-1227) was held in abeyance pending the Supreme Court's decision in *NLRB v. Noel Canning*, concerning the validity of the President's recess appointments of Members Griffin and Block. On June 26, 2014, the Supreme Court issued its decision in *Noel Canning*, 134 S. Ct. 2550 (2014), unanimously holding that these recess appointments were unconstitutional, as the Senate was not in recess at the time.

The Board subsequently set aside its July 15, 2013 Decision and Order and filed a motion to dismiss the appellate case, which was granted by this Court on August 26, 2014. Thereafter, the case was assigned to a new panel of the Board, all of whom had been confirmed by the Senate. (JA 531-532). On January 29, 2015, this new panel of the Board issued its Decision and Order essentially re-adopting its vacated Decision and Order. (JA 533-534). The Board's January 29, 2015 Decision and Order is a final order that disposes of all claims.

Heartland, as an aggrieved party, filed its petition for review in this Court on February 13, 2015, pursuant to section 10(f) of the Act, 29 U.S.C. § 160(f). The

Act does not specify any time period for filing a petition for review. This Court has jurisdiction pursuant to 29 U.S.C. § 160(f). The Board subsequently filed a cross-application for enforcement of its order pursuant to 29 U.S.C. § 160(e).

## STATEMENT OF ISSUES

1. Whether the Board's findings and conclusions that Heartland violated sections 8(a)(1) and (5) of the Act, 29 U.S.C. §§ 158(a)(1), (5) are supported by substantial evidence and are reasonably consistent with the law?

## PERTINENT STATUTES

The pertinent statutes are set out in the addendum to this brief.

## STATEMENT OF CASE

### Procedural History

On December 5, the Union filed a class action grievance alleging that Heartland had violated the collective bargaining agreement ("CBA") between Heartland and the Union by reducing the work hours of dietary employees. (JA 137). On December 13, the Union filed an unfair labor practice charge with the Board alleging that this reduction in work hours constituted an unlawful unilateral change in terms of employment and a violation of § 8(a)(5) of the Act. (JA 8). On December 16, the Union demanded arbitration of its grievance (JA 136), and on January 17, 2012, the Board's Regional Director, finding that "the issues in the charge appear to be covered by provisions of the collective-bargaining agreement"

and that it was "likely that the issues may be resolved through the grievance/arbitration procedure," deferred further processing of the case pending disposition of the arbitration proceeding. (JA 140-143).

An arbitration hearing was conducted before Arbitrator Paul E. Glendon on June 6, 2012. (JA 105-135). Both parties participated, presented evidence, and filed post-hearing briefs. (JA 448-495). On August 1, 2012, Arbitrator Glendon issued his decision finding that Heartland had not violated the CBA and denying the Union's grievance in its entirety. (JA 443-447).

The Regional Director then resumed processing the unfair labor practice charge, and on November 27, 2012, he issued a Complaint and Notice of Hearing. (JA 9-13). The complaint did not allege that Heartland's decision to reduce employee hours was unlawful, but instead alleged only that Heartland had violated §§ 8(a)(5) and (1) of the Act by refusing to bargain over the effects of that decision. Heartland filed a timely answer on December 10, 2012. (JA 14-20). A hearing was held before Administrative Law Judge Ira Sandron ("ALJ") on January 15, 2013, and on March 12, 2013, ALJ Sandron issued a proposed decision and order recommending that the Board find that Heartland violated the Act as alleged. (JA 502-514). Heartland filed timely exceptions to the ALJ's decision with the Board on April 16, 2013. (JA 515-521). On July 15, 2013, a panel of the Board—consisting of Chairman Pearce and Members Griffin and

Block—issued its initial Decision and Order finding that Heartland had violated sections 8(a)(1) and (5) by refusing to bargain over the effects of its decision to reduce employee hours. (JA 522-530).

Heartland subsequently sought review of the Board's order in this Court. The case (No. 13-1227) was held in abeyance pending the Supreme Court's decision in *NLRB v. Noel Canning*, concerning the validity of the President's recess appointments of Members Griffin and Block. On June 26, 2014, the Supreme Court issued its decision in *Noel Canning*, 134 S. Ct. 2550 (2014), unanimously holding that these recess appointments were unconstitutional, as the Senate was not in recess at the time.

The Board subsequently set aside its July 15, 2013 Decision and Order and filed a motion to dismiss the appellate case, which was granted by this Court on August 26, 2014. Thereafter, the case was assigned to a new panel of the Board, all of whom had been confirmed by the Senate. (JA 531-532). On January 29, 2015, this new panel of the Board issued its Decision and Order essentially re-adopting its vacated Decision and Order. (JA 533-534).

**Evidentiary Facts**

**A. The Bargaining Relationship And Collective Bargaining Agreement**

Plymouth Court is a 109-bed facility providing long-term care, as well as skilled nursing rehabilitation, for patients in Plymouth, Michigan. (JA 123). The

Union represents a unit of "all full-time and regular part-time nurses' aides, housekeeping employees, dietary employees, laundry employees, maintenance employees and cooks employed" at the Plymouth facility. (JA 150). The terms and conditions of employment for the unit employees are set forth in a written collective bargaining agreement, effective by its terms from July 8, 2011 through July 8, 2014. (JA 148-178).

Bargaining unit employees are classified as either full-time or part-time, depending upon the number of hours for which they are regularly scheduled. Full-time employees are regularly scheduled for at least 60 hours in a 2-week period. Part-time employees are regularly scheduled for at least 40, but less than 60, hours in a 2-week period. (JA 151). Article 4 of the agreement addresses the subject of "hours of work and overtime," and provides that although a normal work day is 8 hours, "[n]othing contained herein shall guarantee to any employee any number of hours of work per day or week." (JA 152-153).

The CBA contains a management rights clause, (Article 3), which in material part provides:

> Section 1. The Employer shall retain all rights and authority it had prior to entering into this Agreement, including, but not limited to, the unrestricted right to: manage the Center and to direct the work force; . . . to determine and change the size and composition of the work force; to determine the extent to which and the manner and means the Center and its various departments shall be operated or shut down; to determine whether and to what extent any work shall be performed by

> employees; . . . to determine and change starting times, quitting times and shifts; . . . and to assign duties to employees in accordance with the needs and requirements as determined by the Employer. The exercise of the foregoing powers and rights, together with the adoption of policies, rules, and regulations in furtherance thereof, and the use of judgment and discretion in connection therewith, shall be limited only by the specific terms and conditions of this Agreement.

(JA 152).

Article 25, entitled "Waiver," states:

> The parties acknowledge that during the negotiation which resulted in this Agreement each had the unlimited right and opportunity to make demands and proposals with respect to any subject or matter not removed by law from the area of collective bargaining, and that all of the understandings and agreements arrived at by the parties after the exercise of that right and opportunity are set forth in this Agreement and attached Memorandum of Understanding. Therefore, the Employer and the Union for the life of this Agreement each voluntarily and unqualifiedly waives the right, and each agrees that the other shall not be obligated to, bargain collectively with respect to any subjects or matters referred to in this Agreement, even though such subjects or matters may not have been within the knowledge of [sic] contemplation of either or both of the parties at the time they negotiated or signed this Agreement.

(JA 172).

### B. The Reduction In Hours

In September, as a result of federal regulations that significantly curtailed Medicare funding and a state inspection of the facility that temporarily halted new admissions, the patient census at the Plymouth facility dropped from around 90 to

under 70. (JA 92-93; JA 436).[3] The facility operates on a budget that links the number of work hours available in each department to the census. Rather than lay off dietary employees, Cari Mitter, the facility's Director of Food and Nutrition, decided to reduce and reallocate employee hours according to seniority. Although multiple employees had their hours reduced, most were able to pick up additional hours by signing up for weekend work and for certain time slots where there was a shortage of dietary aides. Clondia Finley, a cook, however, declined these opportunities. (JA 123-128).

Although the precise timing is unclear, Union steward Brandi Malone testified at the arbitration hearing, in response to the Union's attorney, that several meetings were held with management in advance of the filing of a grievance for the purpose of resolving the Union's concerns regarding the reduction in hours. According to Malone:

> [T]hey worked out an agreement with Ms. Eartha Finley to keep her hours, but Clondia [Finley] was the only one in the kitchen that didn't return to her normal hours.

(JA 110).[4]

---

[3] Between September 28 and June 4, 2012, the census fluctuated between 64 and 87, with most days being in the 70's. (JA 181-202).

[4] Union representative Kim Fowlkes testified that she knew of an employee named "Belle" having her hours reduced; later, according to Fowlkes, "they took care of Belle's problem." (JA 61). Fowlkes further noted that, "I know that Felicia Slater had a problems [sic] but she fixed hers." (JA 61).

On November 9, Felicia Slater, acting as the Union's steward, filed a class action grievance on behalf of the dietary employees pursuant to step 2 of the grievance procedure. The grievance asserted that Heartland had violated articles 4, 6, 9, and 22 of the CBA by cutting the hours of full-time employees, and that the issue had not been resolved in a step one meeting held on November 3. (JA 137, 158). The grievance progressed through the step procedure and a grievance meeting was held in early December. Present for the Union were Union representative Kim Fowlkes, acting steward Slater, and employee Clondia Finley. Representing Heartland were Regional Human Resource Manager Karen Szkutnik and Administrator Bret Lucka. During this meeting, which lasted between 60 and 90 minutes, Fowlkes argued the Union's position that it was unfair to cut full-time hours and not cut part-time hours and to continue to hire employees into the department. Szkutnik explained the issues with the reduction in census and offered to show Fowlkes the documentation. At some point, the discussion turned to Clondia Finley and her situation. Szkutnik offered Finley the option to work her morning hours and then to return later in the day to pick up additional hours. Finley expressed the belief that she should not have to work a split shift in order to get her hours. (JA 51-60).

On December 19, Szkutnik called Fowlkes and again offered to allow Finley to come in during the afternoon to pick up additional hours. Fowlkes

rejected this proposal and stated that the Union intended to arbitrate. (JA 63-65). By e-mail dated December 20, Szkutnik confirmed the previous day's conversation. (JA 437). Fowlkes responded less than an hour later as follows:

> Karen, I don't know how you figure you are right. . . . This issue has not been resolved. If it were resolved, a grievance would not have been filed, along with a charge. Your resolution makes no sense at all. I'm not going through this anymore with yourself or Bret. Stop cutting the hours of full time employees, and this issue will be resolved. . . . If you were right, a charge would not have been filed. The union would be more than willing to drop all charges, and settle this issue, if you give the employees their full time hours back. I have nothing else to say concerning this matter. . . .

(JA 438).

### C. The Arbitration

On June 6, 2012, an arbitration hearing was held in Livonia, Michigan, before Arbitrator Paul E. Glendon. In his opening statement, the Union's attorney described the Union's case as follows:

> On or around September of last year, 2011, the employer reduced the working hours of several full-time employees, including Clondia Finley and others, from 80 hours to approximately 60 to 64 hours per pay period. The union complained to management, and in fact, they had a number of meetings to discuss what the union believed to be a contract violation as it was related to the reduction of the work hours. Many of—the employer restored many of the hours of the workers, but not all, and in the case of some of the cooks […] their hours were not restored. And it's the position of the Union that this reduction of hours is a violation of the contract, and as a result, Steward Felicia Slater, along with Brandi Malone, filed a class action grievance to protest the violation.

(JA 107).

On August 1, 2012, Arbitrator Glendon issued his decision. (JA 443-447). After summarizing the facts, as well as the positions of both the Employer and the Union, the Arbitrator concluded that "[t]he Employer is correct on all counts." (JA 446). Specifically, Arbitrator Glendon found that Respondent's interpretation of the disputed contract language was proper, and that the word "normal" did not create a guarantee of 80 hours of work per pay period for unit employees. After further finding that nothing in Respondent's actions violated the seniority provisions in the collective bargaining agreement, Arbitrator Glendon ultimately concluded that the Respondent's "reduction of Finley's regularly scheduled work hours below eight per day and/or eighty per pay period did not violate any provision in the agreement, and the grievance must be denied." (JA 447).

## SUMMARY OF ARGUMENT

The Board's decision suffers from numerous errors of law and is patently inconsistent with this Court's long-standing precedents. No one disputes the unremarkable assertion that work hours are a mandatory subject of bargaining, but where, as here, the parties have negotiated a collective bargaining agreement that addresses how a particular subject—employee hours—will be handled, the Union's bargaining rights regarding that subject have been fully exercised for the life of the agreement. *NLRB v. United States Postal Service*, 8 F.3d 832, 833-834, 836 (D.C. Cir. 1993). "Unless the parties agree otherwise, there is no continuous duty to

bargain during the term of an agreement with respect to a matter covered by the contract." *Id.* at 836. The Board, however, did not apply this "contract coverage" analysis, choosing instead to decide the case solely under the more stringent "waiver" standard that this Court has consistently rejected for more than twenty years.

The Board's attempt to bifurcate the "effects" from the "decision" itself is unavailing. In *Enloe Medical Center v. NLRB*, 433 F.3d 834 (D.C. Cir. 2005), this Court rejected the exact same contention in a case where the Board found that although the employer was authorized by the contract to adopt a new mandatory on-call policy, the employer unlawfully refused to bargain over the "effects" of the policy. The court noted that the contract coverage analysis was equally applicable to the effects of a decision and that it would be unusual "to interpret a contract as granting an employer the unilateral right to make a particular decision but as reserving a union's right to bargain over the effects of that decision." *Id.* at 839. As was the case in *Enloe*, the Union here never identified any specific "effect" that it wished to discuss and instead limited its position to the contention that Heartland had no contractual authority to reduce employee hours.

The Board's refusal to apply the proper legal standard is exacerbated by its refusal to defer to the arbitrator's decision finding that Heartland acted within its rights under the CBA, as interpreted by the arbitrator. The Board's assertion that

the parties did not present the statutory "effects bargaining" issue to the arbitrator and thus the arbitrator did not decide this issue is disingenuous. The charge that the Regional Director initially deferred to the arbitration process did not mention "effects bargaining," but instead contended that Heartland "made unilateral changes to the working terms and conditions of the employees." This was consistent with the Union's grievance, which claimed that Heartland had violated articles 4, 6, 9, and 22 of the CBA by cutting hours of work. Further, in deferring, the Director expressed the belief that "[s]ince the issues in the charge appear to be covered by provisions of the collective-bargaining agreement, it is likely that the issues may be resolved through the grievance/arbitration procedure." Given this background, the arbitrator, not surprisingly, framed the issue presented to him as follows: "Did the Employer violate the parties' agreement by reducing the regular work hours of Clondia Finley below eight per day and eighty per pay period due to a major continuing drop in resident census?" The arbitrator answered that question in the negative and he set forth his reasons for interpreting the CBA in this manner.

In fact, the entire premise of the Board's decision—Heartland refused to bargain over the effects of its lawful decision to reduce employee hours—is an imaginary issue constructed by the Regional Director following the issuance of the arbitrator's decision. Effects bargaining was a non-issue to the Union, and it never made a request to bargain over the effects. The Board's "fait accompli" analysis is

inconsistent with *Enloe* and fails to appreciate that no employees lost their jobs as a result of the decision to reduce hours. Thus, the Union continued to represent employees following the reduction in hours and its bargaining power remained intact. Heartland requests that this Court deny enforcement of the Board's Decision and Order.

## STATEMENT OF STANDING

Heartland is an employer within the meaning of section 2(2) of the Act. 29 U.S.C. § 152(2). The Board's General Counsel issued a complaint alleging that Heartland engaged in certain unfair labor practices under sections 8(a)(1) and (5) of the Act. 29 U.S.C. §§ 158(a)(1) and (5). The Board subsequently issued a final order finding that Heartland had engaged in certain unfair labor practices. The Board's order directs that Heartland cease and desist from such conduct, post a Notice to Employees, bargain with the Union, and provide limited make whole relief to specific employees. Heartland is an "aggrieved" party within the meaning of section 10(f) of the Act, 29 U.S.C. § 160(f), and has standing under that section to seek review of the Board's final order in this court.

## ARGUMENT

### Standard Of Review

This case involves the Board's continuing refusal to apply the "contract coverage" analysis required by this Court. It is a familiar principle that "once a

court has issued a legal ruling on a disputed issue, the Board is bound to follow the court's judgment unless and until it is reversed by the Supreme Court." *Vincent Industrial Plastics, Inc. v. NLRB*, 209 F.3d 727, 739 (D.C. Cir. 2000). The contract coverage analysis turns on an interpretation of the collective bargaining agreement, and the federal courts do "not defer to the Board's interpretation of a collective bargaining agreement." *Enloe*, *supra*, at 837. Where as here, an arbitrator has authoritatively construed the collective bargaining agreement, the court "must give the award the greatest deference possible—the award must be enforced so long as the arbitrator purports to be interpreting the contract rather than dispensing 'his own brand of industrial justice.'" *Utility Workers Union of America*, *Local 246 v. NLRB*, 39 F.3d 1210, 1216 (D.C. Cir. 1994) (quoting *United Steelworkers v. Enterprise Wheel & Car Corp.*, 363 U.S. 593, 597 (1960)). The Board's failure to follow its own standards for deferral constitutes an abuse of discretion. *Titanium Metals Corp. v. NLRB*, 392 F.3d 439, 446 (D.C. Cir. 2004).

Insofar as the Board is engaged in fact finding, the court assesses whether the Board's findings are supported by substantial evidence. *International Transportation Service, Inc. v. NLRB*, 449 F.3d 160, 163 (D.C. Cir. 2006). The Board "is not free to prescribe what inferences from the evidence it will accept and reject, but must draw all those inferences that the evidence fairly demands." *Allentown Mack Sales and Service, Inc. v. NLRB*, 522 U.S. 359, 378 (1998). The

court's "review must take into account whatever in the record fairly detracts from the weight of the evidence cited by the Board to support its conclusions; we will not merely rubberstamp NLRB decisions." *Cleveland Construction, Inc. v. NLRB*, 44 F.3d 1010, 1014 (D.C. Cir. 1995).

**Discussion Of Issues**

**A. The CBA Covered The Subject Of Employee Hours. The Union's Statutory Bargaining Rights Have Been Fully Exercised. The Board Erred In Applying Its Waiver Analysis.**

Despite repeated rejection by the courts, the Board has steadfastly refused to apply the "contract coverage" analysis utilized by this Court in situations where the issue over which the employer has allegedly refused to bargain is addressed in a collective bargaining agreement. *Enloe*, *supra*, 433 F.3d at 837-838.[5] Instead, the Board has clung fast to its "waiver" analysis, while doggedly refusing to seek certiorari in the Supreme Court. This case is yet another example, as the Board openly acknowledged in its decision: "In analyzing the effects bargaining allegation, we apply 'one of the oldest and most familiar of Board doctrines, the clear and unmistakable waiver standard,' not the 'contract coverage' standard argued by the Respondent." (JA 522, n.1) (internal citation omitted).

[5] The "contract coverage" analysis has also been adopted by the First Circuit, *Bath Marine Draftsmen's Assoc. v. NLRB*, 475 F.3d 14 (1st Cir. 2007), and the Seventh Circuit, *Chicago Tribune Co. v. NLRB*, 974 F.2d 933 (7th Cir. 1992).

The two standards are analytically distinct:

> A waiver occurs when a union knowingly and voluntarily *relinquishes* its right to bargain about a matter; but where the matter is covered by the collective bargaining agreement, the union *has exercised* its bargaining right and the question of waiver is irrelevant.

*USPS*, *supra*, 8 F.3d at 836 (quoting *Dep't of Navy v. FLRA*, 962 F.2d 48, 57 (D.C. Cir. 1992) (emphasis in original)). "In a case such as this one, where the employer acts pursuant to a claim of right under the parties' agreement, the resolution of the refusal to bargain charge rests on an interpretation of the contract." *USPS* at 836. "Unless the parties agree otherwise, there is no continuous duty to bargain during the term of an agreement with respect to a matter covered by the contract." *Id.* "[N]either the Board nor the courts may abrogate a lawful agreement merely because one of the bargaining parties is unhappy with a term of the contract and would prefer to negotiate a better arrangement." *Id.* Thus, "questions of waiver normally do not come into play with respect to subjects already covered by a collective bargaining agreement." *Id.* at 836-837.

The Board does not contend that Heartland had any obligation to bargain over the *decision* to reduce employee hours. The Board's General Counsel concedes in his Complaint that Heartland acted "in response to low patient census and pursuant to Articles 3 and 4 of the collective-bargaining agreement." (JA 10). Presumably, it is the Board's position that these contractual articles, as interpreted

by the arbitrator, *waived* the Union's right to bargain over the decision itself. It would be an unusual collective bargaining agreement that did not cover the subject of employee work hours, and the CBA in this case is no exception. Thus, the same end-result is also easily reached under a contract coverage analysis.

As the Union's charge alleged that Heartland had unilaterally changed employee work hours, this should have been the end of the case. But for reasons that are not apparent, the Director, following the issuance of the arbitrator's decision, *sua sponte* took the investigation in a different direction, focusing on the issue of effects bargaining. This issue was one that was not on either Heartland's or the Union's radar, was not alleged in the charge, and was a creation of the Director's imagination. In any event, the effects bargaining analysis is governed by the same contract coverage analysis that applies to the issue of decision bargaining. In *Enloe*, *supra*, the court refused to enforce a Board order finding that the employer had unlawfully refused to bargain over the effects of a mandatory on-call policy adopted by the employer pursuant to its rights under a collective-bargaining agreement. The court explained:

> Whether the parties contemplated that the collective bargaining agreement would treat the effects of a decision separately from the decision itself is just as much a matter of ordinary contract interpretation as is the initial determination of whether the agreement covers the matter altogether. It would be rather unusual, moreover, to interpret a contract as granting an employer the unilateral right to make a particular decision but as reserving a union's right to bargain over the effects of that

> decision. This is not to say that such an interpretation is inconceivable, but it would seem that there would have to be some language or bargaining history to support the proposition that the parties intended to treat the issues separately.

433 F.3d at 838-839.

Here, it is conceded that the collective bargaining agreement gave management the right to reduce employee hours without bargaining with the Union. Further, the Board cites to no contractual language or bargaining history that would show that the parties intended to treat the effects differently than the decision itself. Indeed, unlike *Enloe*, the collective bargaining agreement here contains a zipper clause (JA 172), providing that there was no continuing obligation to bargain "with respect to any subjects or matters referred to in this Agreement, even though such subjects or matters may not have been within the knowledge of [sic] contemplation of either or both of the parties at the time they negotiated or signed this Agreement." This language demonstrates that the parties intended the agreement to be the complete resolution of all "subjects" addressed in the agreement. Thus, there is no need here to rely on a presumption; the agreement language is dispositive.

The court in *Enloe* further relied upon the union's own conduct to support its conclusion:

> The fact that the parties to the collective bargaining agreement in this case never contemplated a dichotomy between the management rights granted Enloe and the effects of those rights

> is amply demonstrated by the Union's behavior when Enloe announced the new mandatory on-call policy. The Union never identified any particular discrete effect about which it was seeking bargaining. Instead, the May 9 e-mail from Union representative Baker asserted that the contract "[did] not give Enloe the right to unilaterally change [a registered nurse's] working conditions." This suggests that the Union was objecting to the on-call policy change itself, and the concluding sentence of the May 9 e-mail-stating that "Enloe does not have the 'right' to change one's working conditions without first bargaining the impacts with the union"-merges the effects with the policy change. (Indeed, the Union had already filed an unfair labor practices charge on May 5.) Even if a contract distinguished a policy decision from its effects, it would unlikely be interpreted to require the employer to delay the decision while it bargained over effects.

*Id.* at 839.

The *Enloe* court's observations are equally applicable here. As the ALJ acknowledged, the Union never requested to bargain over the effects of the decision. (JA 527). Indeed, it made no request to bargain at all. Neither the Union nor the Board has identified any specific "effects" of Respondent's decision to temporarily reduce employee hours other than those that are inherent in the decision, i.e., reduced work hours. The Union's position throughout the grievance process was that the collective bargaining agreement precluded Respondent from reducing employee hours. There was no contention that the reduction in work hours triggered any other adverse consequences such as layoffs, increased work loads, or expanded job duties (and any such effects would also be covered by the contract).

The Board's conclusion that Heartland unlawfully refused to bargain over the effects of its lawful decision to reduce employee work hours cannot be sustained under the contract coverage analysis applicable in this circuit. But even if a waiver analysis were applied, the result would be the same. A waiver must be "clear and unmistakable" and will not be "infer[red] from a general contractual provision . . . unless the undertaking is 'explicitly stated,'" *Metropolitan Edison Co. v. NLRB*, 460 U.S. 693, 709 (1983), but there is nothing "general" about the relevant contractual articles. As noted, the Board presumably agrees that Articles 3 and 4, as interpreted by the arbitrator, effectively waived any right to bargain over Heartland's decision to reduce employee hours. This is important because Article 25, the "Waiver" article, "voluntarily and unqualifiedly waives the right, and each [party] agrees that the other shall not be obligated to, bargain collectively *with respect to any subjects or matters referred to in this Agreement*, even though such subjects or matters may not have been within the knowledge of [sic] contemplation of either or both of the parties at the time they negotiated or signed this Agreement." [Emphasis supplied]. Inasmuch as the subject of work hours is addressed in Articles 3 and 4, the undeniable effect of Article 25 is to waive the right to bargain further on this subject during the term of the agreement. This waiver unambiguously encompasses not only the decision to reduce work hours,

but the effects of such decision. There is no requirement that the agreement specifically mention "effects bargaining."

Explicit waiver or "zipper" clauses are binding, are not repugnant to the Act, and "will be given meaning and effect." *Radioear Corp.*, 214 NLRB 362, 364 (1974). The Board has long distinguished between using a zipper/waiver clause as a "sword" and using it as a "shield." *CBS Corp.*, 326 NLRB 861, 861-862 (1998); *GTE Automatic Electric*, *Inc.*, 261 NLRB 1491, 1491-92 (1982). Such a clause may not be used by either party to justify a unilateral change or to force the other party to engage in mid-term bargaining, but it may be used as a shield to refuse to engage in mid-term bargaining. The zipper clause in *GTE* waived the right to bargain mid-term on all subjects and matters, included or non-included, known or unknown. The Board held that the employer could use the clause as a shield to refuse to bargain over a new benefit not provided for in the collective bargaining agreement and "to maintain the status quo regarding the terms and conditions of employment of unit employees." 261 NLRB at 1491-92. The same result follows here. The Union could not compel Heartland to bargain mid-term over the subject of employee work hours even if it did not foresee the full impact of its agreement.

### B. The Arbitrator's Decision Is Determinative Of This Contractual Dispute. Deferral Is Required.

The Board not only refused to apply the correct legal standard, but its decision fails to accord proper weight to the arbitrator's decision construing the

contract and misapplies the Board's deferral precedents. Although the Board, by not challenging Heartland's right to make the decision to reduce employee hours, implicitly deferred in part to the arbitrator's award, it declined to defer on the issue of "effects bargaining" because "the issue of the Respondent's obligation to engage in effects bargaining was not raised in the arbitral hearing or in the parties' posthearing briefs to the arbitrator; nor did the arbitrator's decision address any duty to bargain issue." (JA 522). This analysis does not withstand scrutiny.

The Board's deferral policy is defined by its decisions in *Spielberg Manufacturing Corp.*, 112 NLRB 1080 (1955) and *Olin Corp.*, 268 NLRB 573 (1984).[6] In *Spielberg*, the Board held that in order to facilitate "the desirable objective of encouraging the voluntary settlement of labor disputes," it would defer to arbitral awards when "the proceedings appear to have been fair and regular, all parties had agreed to be bound, and the decision of the arbitration panel is not clearly repugnant to the purposes and policies of the Act." 112 NLRB at 1082. Following some meandering back and forth regarding the necessity for the arbitrator to have explicitly considered the statutory issue and the proper assignment of the burden of proof, the Board announced in *Olin* that:

[6] Between its initial decision in 2013 and its subsequent decision in 2015, the Board adopted a new deferral standard in *Babcock & Wilcox Construction Co.*, 361 NLRB No. 132 (2014). However, because the new standard is only being applied prospectively, the *Spielberg/Olin* analysis applies here. (JA 533).

> We would find that an arbitrator has adequately considered the unfair labor practice if (1) the contractual issue is factually parallel to the unfair labor practice issue, and (2) the arbitrator was presented generally with the facts relevant to resolving the unfair labor practice. In this respect, differences, if any, between the contractual and statutory standards of review should be weighed by the Board as part of its determination under the *Spielberg* standards of whether an award is "clearly repugnant" to the Act. And, with regard to the inquiry into the "clearly repugnant" standard, we would not require an arbitrator's award to be totally consistent with Board precedent. Unless the award is "palpably wrong," i.e., unless the arbitrator's decision is not susceptible to an interpretation consistent with the Act, we will defer.
>
> Finally, we would require that the party seeking to have the Board reject deferral and consider the merits of a given case show that the above standards for deferral have not been met. Thus, the party seeking to have the Board ignore the determination of an arbitrator has the burden of affirmatively demonstrating the defects in the arbitral process or award.

268 NLRB at 574.

"The Board strongly favors deferral to arbitration as a means of encouraging parties to voluntarily resolve unfair labor practice issues such as that involved here." *Kvaerner Philadelphia Shipyard, Inc.*, 347 NLRB No. 36 (2006). Thus, the burden of a party opposing deferral has been characterized as a "heavy" one. *Aramark Services, Inc.*, 344 NLRB 549, 550 (2005).

It is true, as the Board notes, that neither the parties nor the arbitrator invoked the term "effects bargaining." That is not surprising since neither the Union's charge, nor the Director's letter announcing his decision to defer under

*Collyer Insulated Wire*, 192 NLRB 837 (1971), makes any mention of effects bargaining, or decision bargaining for that matter. The Union's position in both its charge and at arbitration was not that Heartland failed to bargain, but that it acted contrary to the terms of the collective bargaining agreement. The issues were parallel, as the Director acknowledged, because they required an interpretation of the agreement, which is precisely what the arbitrator gave the parties.

In fact, the effects bargaining issue is a false issue that simply does not exist in a case such as this where the dispute is over the employer's contractual rights. The decision/effects bargaining dichotomy arose in an entirely different context, *i.e.* whether certain types of significant managerial decisions affecting the availability of employment constituted "terms and conditions of employment" and thus were within the scope of mandatory bargaining under Section 8(d) of the Act. It was not until 1962 that the Board first adopted the concept of decision/effects bargaining. Overruling prior decisions finding no duty to bargain over a subcontracting decision, the Board held that subcontracting *decisions*, as well as their effects, were mandatory subjects of bargaining. *Town & Country Manufacturing Co.*, 136 NLRB 1022 (1962), *enf'd*, 316 F.2d 846 (5th Cir. 1963). Thereafter, during the 1960s, the Board reached similar conclusions regarding managerial decisions to sell, close, relocate, and transfer work. Member Leedom frequently concurred, and in his view the bargaining obligation did not extend to

management decisions of this nature, but only to the "effects" of the decisions. *E.g.*, *Pepsi-Cola Bottling Co.*, 145 NLRB 785 (1964) (plant shutdown); *Adams Dairy Co.*, 147 NLRB 1410 (1964) (subcontracting); *Ozark Trailers, Inc.*, 161 NLRB 561 (1966) (plant shutdown).

Although the Supreme Court approved the Board's position regarding subcontracting decisions, *Fibreboard Corp. v. NLRB*, 379 U.S. 203 (1964), the majority of the circuit courts took a narrower view regarding other significant management decisions to sell, close, relocate, and transfer work, concluding (in agreement with Member Leedom's view) that the bargaining obligation was limited to the effects of such decisions. *E.g.*, *NLRB v. Royal Plating & Polishing Co.*, 350 F.2d 191 (3d Cir. 1965); *NLRB v. Transmarine Navigation Co.*, 380 F.2d 933 (9th Cir. 1967); *NLRB v. Thompson Transport Co.*, 406 F.2d 698 (10th Cir. 1969). In *First National Maintenance Corp. v. NLRB*, 452 U.S. 666 (1981), the Court concluded that partial closing decisions were not subject to bargaining, but it acknowledged that the effects of such decisions were a mandatory subject of bargaining. *Id.* at 677, n.15. The Court expressed "no view as to other types of management decisions, such as plant relocations, sales, other kinds of subcontracting, automation, etc., which are to be considered on their particular facts." *Id.* at 686, n.22.

The concept of decision and effects bargaining is logical when there is no collective bargaining agreement in place, and the Board is determining whether the employer had a statutory (as opposed to contractual) right to take certain unilateral action. It also may be logical when there is an agreement in place, but that agreement does not address a particular decision. The obligation to bargain is not static and continues during the term of an agreement, subject of course to the provisions of the agreement. But where as is the case here, an agreement is in place that addresses the manner in which particular subjects and issues will be handled, the concept makes no sense at all. "A collective bargaining agreement is an effort to erect a system of industrial self-government." *United Steelworkers of America v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 580 (1960). "It is more than a contract; it is a generalized code to govern a myriad of cases which the draftsmen cannot wholly anticipate." *Id.* at 578. Such agreements are subject to construction and interpretation by arbitrators in most cases, and the "parties expect that his judgment of a particular grievance will reflect not only what the contract says but, insofar as the collective bargaining agreement permits, such factors as the effect upon productivity of a particular result, its consequence to the morale of the shop, his judgment whether tensions will be heightened or diminished." *Id.* at 582.

When an arbitrator resolves a particular grievance under a collective bargaining agreement, he has no occasion to distinguish between a decision and its

effects. The entire problem is before him and it matters not whether a particular issue is properly categorized as an aspect of the underlying decision or an effect of that decision. So long as his decision draws its essence from the contract, his ability to remedy the problem is plenary. “For the parties’ objective in using the arbitration process is primarily to further their common goal of uninterrupted production under the agreement, to make the agreement serve their specialized needs.” *Id.*

Here, the parties presented all of their facts, arguments, and theories to the arbitrator. The evidence addressed not only the decision to reduce employee hours, but the impact of that decision on various individual employees, including most notably Claudia Finley. The evidence also addressed the adequacy of the efforts of the parties to address the impact of the decision on Finley and others. The effects of the decision were as much before the arbitrator as the decision itself. His job, which he clearly did, was to bring a final resolution to the grievance and thereby further industrial peace. The Board’s subsequent side-trip down the effects bargaining alley unnecessarily and improperly disrupted the resolution provided by the arbitrator.

The contract interpretation issue was parallel to the statutory issue because “[t]he presence of contractual authorization for the respondent’s action is determinative of the unfair labor practice allegation.” *Dennison National Co.*, 296

NLRB 169, 170 (1989). In *Dennison*, the arbitrator declined to address the union's waiver argument because it was "a statutory issue that must be decided by the NLRB." Nevertheless, the Board deferred to the arbitrator's award. The Board rejected the contention that the arbitrator was not presented with the facts relevant to the statutory issue:

> [T]he record shows that the arbitrator received ample evidence, i.e., the parties contract and evidence of past practice. The Board would necessarily consider the same facts in reaching a decision on the Union's unilateral change allegation.

*Id. See also, Bay Shipbuilding Corp.*, 251 NLRB 809 (1980).

Similarly, in *Smurfit-Stone Container Corp.*, 344 NLRB 658 (2005), the Board declined to find an unlawful unilateral change and deferred to an arbitrator's decision finding that the employer acted within its contractual rights by instituting a new attendance policy. The Board concluded that the arbitrator "adequately addressed the statutory issue by determining the contractual issue." *Id.* at 659. It also is not necessary that the award use any magic phrases such as a "clear and unmistakable waiver." *Id.* at n.4 (citing *Southern California Edison*, 310 NLRB 1229, 1231 (1993), *rev. denied*, 39 F.3d 1210 (D.C. Cir. 1994) and *Olin*, 268 NLRB at 576).

Because the arbitrator did the job with which he was charged, stayed within the bounds of the contract, interpreted the relevant contract language, and issued an

award resolving the entire dispute between the parties, the Board erred by disregarding that decision. Deferral was required.

### C. The Union Never Made A Request To Bargain Over The Effects Of The Decision. Alternatively, The Respondent Satisfied Its Effects Bargaining Obligation.

The ALJ conceded that "the Union never specifically requested effects bargaining per se," but found that "such a request was implicit in its grievance and its request that the status quo ante be restored." (JA 527). Thus, he concluded that the Union did not clearly waive its right to bargain over effects. The Board agreed that there was no waiver, but did so based on its conclusion that the union was presented with a "fait accompli." (JA 522). Neither theory stands up to scrutiny.

First, with respect to the Union's grievance, merely filing a grievance does not adequately inform an employer that the union wishes to bargain over the "effects" of the employer's decision, particularly when the grievance makes no reference at all to bargaining. Here, at the unfair labor practice hearing, the parties stipulated that although Respondent issued a subpoena requesting any such record in existence, no document has been submitted to demonstrate that the Union has requested effects bargaining at any point either before or after the hours were reduced. (JA 88-89, 501). But if we accept that the grievance was a request to engage in effects bargaining, it surely follows that the grievance/arbitration process itself constituted effects bargaining. After all, the "grievance/arbitration process is

part and parcel of the collective bargaining process itself." *Warrior & Gulf Navigation Co.*, *supra*, 363 U.S. at 578 (1960). The inquiry is not whether the grievance process meets the Board's assessment of adequate effects bargaining. Instead, the inquiry is whether the grievance process actually functioned as designed to its agreed-upon conclusion. It clearly did, and the arbitrator's decision represented the final and binding culmination of the bargaining process.

The Union clearly was of the view that the parties had attempted to resolve the impact of the decision on employees. Thus, steward Brandi Malone testified regarding meetings between the parties in which the concerns of most employees were resolved. And the Union's counsel acknowledged in his opening statement at the arbitration hearing that solutions had been worked out for most of the affected employees. "Counsel can make admissions during trial that will bind the client" and "such admissions can be derived from the contents of opening statements or closing arguments." *Butynsky v. Springfield Terminal Railway Co.*, 592 F.3d 272, 277 (1st Cir. 2010); *accord*, *Packaging Techniques, Inc.*, 317 NLRB 1252, 1254-55 (1995). Although no solution was achieved for Clondia Finley, she was offered options to pick up hours, which she rejected. The parties did not label their efforts as "effects bargaining," but that is clearly what they were doing both before the Union actually filed a grievance and during the grievance procedure itself.

The Board's "fait accompli" analysis fares no better. Although the Supreme Court has expressed agreement with the proposition that effects bargaining must occur "in a meaningful manner and at a meaningful time," *First National Maintenance*, *supra*, 452 U.S. at 681-682, it is not true that such bargaining must always occur before the decision is implemented in any fashion. As this Court noted in *Enloe*, "[e]ven if a contract distinguished a policy decision from its effects, it would unlikely be interpreted to require the employer to delay the decision while it bargained over effects." 433 F.3d at 839.

The Board has held that there "must be an opportunity to bargain at a time when the Union retained at least a measure of bargaining power." *Metropolitan Teletronics Corp.*, 279 NLRB 957, 959 (1986), *enf'd*, 819 F.2d 1130 (2d Cir. 1987) (Table). In *Metropolitan*, the Board found that the union lacked such an opportunity because it was "denied an opportunity to bargain at a time when it still represented employees upon whom the Company relied for services." *Id.* Similarly, in *Komatsu America Corp.*, 342 NLRB 649 (2004), the Board noted the significance of the union having an opportunity to bargain while it still represented employees and concluded that the union in that case did have such an opportunity. *Id.* at 649.

Here, no employee lost his or her job as a result of the decision to reduce hours and the Union has continuously represented employees upon whom

Heartland relies for services. Thus, the Union's bargaining power, whatever it may have been, was not diminished in any respect. Of course, when, as is the case here, a collective bargaining agreement is in place and that agreement contains a binding grievance/arbitration process and a no-strike clause, (JA 158-161), the union's bargaining power is likely to be severely circumscribed by virtue of the agreement. *Id.* at 659.

The Union's failure to request effects bargaining is yet another impediment to enforcement of the Board's decision. If there was an effects bargaining obligation, it was satisfied.

### D. The Board's Limited Backpay Remedy Constitutes An Abuse Of Discretion.

Assuming, *arguendo*, that this Court agrees with the Board's finding of an effects bargaining violation, the Board abused its discretion by granting even the limited differential backpay remedy that it granted. (JA 523). As discussed above, this is not a case in which the union had no employees to represent and lacked any bargaining power. All that occurred was that employees suffered some reduction in hours, but this reduction was concededly lawful. To award employees a minimum of two weeks of differential pay is to detract from the undisputed right of Heartland to reduce employee hours. If further effects bargaining is warranted, there is no reason why it cannot occur without granting employees a windfall.

The *Transmarine* remedy is typically granted in situations where the employer's decision results in a loss of jobs. Indeed, in *Transmarine Navigation Corp.*, 170 NLRB 389 (1968), the decision involved a facility closing. *See also*, *Bridon Cordage*, *Inc.*, 329 NLRB 258 (1999) (decision to reduce inventory resulted in layoffs). This remedy is not routinely granted in effects bargaining cases where the decision results in  no loss of jobs. For example, in *Good Samaritan Hospital*, 335 NLRB 901 (2001), the Board found a violation in the employer's failure to bargain over the effects of a decision to change staffing matrices, but did not include a *Transmarine* remedy. Here, no employee lost his/her job, and the matter was processed through arbitration. Granting even a limited *Transmarine* remedy would undermine the arbitrator's decision.

The Employer contends that no backpay remedy is appropriate or warranted. However, if he Board acted within its authority in granting a limited backpay remedy, it abused its discretion by linking the backpay period to the date of the Board's decision. Because this decision is under review, any backpay period should not begin to run until the date of any decision enforcing the Board's order.

**CONCLUSION**

Heartland respectfully requests that the Board's decision be denied enforcement in its entirety.

Respectfully submitted,

/s/ Charles P. Roberts, III

Charles P. Roberts, III
CONSTANGY, BROOKS, SMITH
& PROPHETE, LLP
100 North Cherry Street, Suite 300
Winston-Salem, North Carolina 27101
(336) 721-1001

Clifford H. Nelson, Jr.
CONSTANGY, BROOKS, SMITH
& PROPHETE, LLP
230 Peachtree Street, Suite 2400
Atlanta, Georgia 30303
(404) 525-6955

*Counsel for Petitioner*

# CERTIFICATE OF COMPLIANCE

1. This brief complies with the type-volume limitation of Fed. R. App. P. 28.1(e)(2) or 32(a)(7)(B) because:

   [ X ] this brief contains [*8,397*] words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), *or*

   [ ] this brief uses a monospaced typeface and contains [*state the number of*] lines of text, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

   [ X ] this brief has been prepared in a proportionally spaced typeface using [*Microsoft Word 2007*] in [*14pt Times New Roman*]; *or*

   [ ] this brief has been prepared in a monospaced typeface using [*state name and version of word processing program*] with [*state number of characters per inch and name of type style*].

Dated: June 15, 2015

/s/ Charles P. Roberts, III
*Counsel for the Petitioner*

## CERTIFICATE OF FILING AND SERVICE

I hereby certify that on this 15th day of June, 2015, I caused this Brief of Petitioner and Joint Appendix to be filed electronically with the Clerk of the Court using the CM/ECF System, which will send notice of such filing to the following registered CM/ECF users:

Linda Dreeben
Robert J. Englehart
Kellie J. Isbell
NATIONAL LABOR RELATIONS BOARD
APPELLATE AND SUPREME COURT
LITIGATION BRANCH
1099 14th Street, NW
Washington, DC 20570
(202) 273-2960

*Counsel for Respondent*

I further certify that on this 15th day of June, 2015, I caused the required copies of the Brief of Petitioner and Joint Appendix to be hand filed with the Clerk of the Court.

/s/ Charles P. Roberts, III
*Counsel for the Petitioner*

# STATUTORY ADDENDUM

# National Labor Relations Act

**Sec. 8 [29 U.S.C. § 158]**

**(a) Unfair labor practices by employer**

It shall be an unfair labor practice for an employer—

**(1)** to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157of this title;

. . . .

**(5)** to refuse to bargain collectively with the representatives of his employees, subject to the provisions of section 159 (a) of this title.

**(d) Obligation to bargain collectively**

For the purposes of this section, to bargain collectively is the performance of the mutual obligation of the employer and the representative of the employees to meet at reasonable times and confer in good faith with respect to wages, hours, and other terms and conditions of employment, or the negotiation of an agreement, or any question arising thereunder, and the execution of a written contract incorporating any agreement reached if requested by either party, but such obligation does not compel either party to agree to a proposal or require the making of a concession: Provided, That where there is in effect a collective-bargaining contract covering employees in an industry affecting commerce, the duty to bargain collectively shall also mean that no party to such contract shall terminate or modify such contract, unless the party desiring such termination or modification—

**(1)** serves a written notice upon the other party to the contract of the proposed termination or modification sixty days prior to the expiration date thereof, or in the event such contract contains no expiration date, sixty days prior to the time it is proposed to make such termination or modification;

**(2)** offers to meet and confer with the other party for the purpose of negotiating a new contract or a contract containing the proposed modifications;

**(3)** notifies the Federal Mediation and Conciliation Service within thirty days after such notice of the existence of a dispute, and simultaneously therewith notifies any State or Territorial agency established to mediate and conciliate disputes within the State or Territory where the dispute occurred, provided no agreement has been reached by that time; and

**(4)** continues in full force and effect, without resorting to strike or lock-out, all the terms and conditions of the existing contract for a period of sixty days after such notice is given or until the expiration date of such contract, whichever occurs later:

**Sec. 10 [29 U.S.C. § 160]**

(e) The Board shall have power to petition any court of appeals of the United States, or if all the courts of appeals to which application may be made are in vacation, any district court of the United States, within any circuit or district, respectively, wherein the unfair labor practice in question occurred or wherein such person resides or transacts business, for the enforcement of such order and for appropriate temporary relief or restraining order, and shall file in the court the record in the proceeding, as provided in section 2112 of Title 28. Upon the filing of such petition, the court shall cause notice thereof to be served upon such person, and thereupon shall have jurisdiction of the proceeding and of the question determined therein, and shall have power to grant such temporary relief or restraining order as it deems just and proper, and to make and enter a decree enforcing, modifying and enforcing as so modified, or setting aside in whole or in part the order of the Board. No objection that has not been urged before the Board, its member, agent, or agency, shall be considered by the court, unless the failure or neglect to urge such objection shall be excused because of extraordinary circumstances. The findings of the Board with respect to questions of fact if supported by substantial evidence on the record considered as a whole shall be conclusive. . . .

(f) Any person aggrieved by a final order of the Board granting or denying in whole or in part the relief sought may obtain a review of such order in any United States court of appeals in the circuit wherein the unfair labor practice in question was alleged to have been engaged in or wherein such person resides or transacts business, or in the United States Court of Appeals for the District of Columbia, by filing in such court a written petition praying that the order of the Board be modified or set aside. . . .